[No. G033482. Fourth Dist., Div. Three. Nov. 28, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
GILBERT GARCIA, Defendant and Appellant.

522

COUNSEL

J. Courtney Shevelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and Jeffrey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**MOORE, J.**—A jury convicted Gilbert Garcia of the February 20, 1995, first degree murder of Simindokht Roshdieh (Simindokht), the attempted murder of her husband, Firooz Roshdieh (Firooz), and being a convicted felon in possession of a firearm. It found true robbery-murder and burglary-murder special circumstances and allegations Garcia used a firearm in the commission of the murder, attempted murder and gun possession, inflicted great bodily injury during the attempted murder, and had a prior serious or violent felony conviction for assault with a deadly weapon within the meaning of the "Three Strikes" law and for the purposes of Penal Code sections 667, subdivision (a)(1) and 1192.7, subdivision (c). (All further statutory references are to the Penal Code unless otherwise stated.) The jury fixed the punishment at life in prison without the possibility of parole following a separate penalty trial.

Although the guilt phase record in this case consisted of more than 700 pages of clerk's transcript, 1,907 pages of reporter's transcript and over 100 exhibits, Garcia raises a single issue on appeal. He challenges the trial court's exclusion of one hearsay statement, arguing the exclusion of this single piece of evidence amounts to a deprivation of his right to due process as provided for in the Fourteenth Amendment to the United States Constitution. He also claims the trial court erred by failing to conduct an Evidence Code section 402 hearing to elicit facts bearing on the reliability of the hearsay statement.

■ Generally, the exclusion of defense evidence on a minor or subsidiary point does not interfere with the accused's right to due process. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103 [31 Cal.Rptr.2d 321, 875 P.2d 36].) However, this was a thought-provoking case for the following reasons: (1) Various witnesses identified another person, Manuel Rodriguez, as the perpetrator of the crime in 1995, and then identified Garcia in 2001; (2) Rodriguez and Garcia have similar facial features and tattoos; (3) eyewitnesses positively identified both men in photographic and live lineups; (4) there is no physical evidence connecting Garcia or Rodriguez to the murder; and, (5) the prosecution's case rested in large part on Rodriguez's testimony and the testimony of Nydessa Whitaker, Garcia's former wife and an uncharged accomplice in the crimes. Nevertheless, as discussed more fully below, we conclude the exclusion of a single piece of inadmissible hearsay evidence did not result in an unfair trial and affirm the judgment.

I

FACTS

*Background*

On February 20, 1995, a series of four robberies was committed in Orange County. The first robbery occurred at a Conroy's Flowers store on Harbor Boulevard in Costa Mesa. It was reported to police at approximately 8:38 p.m. At 8:47 p.m., another robbery was reported to have occurred at the Blockbuster music store also on Harbor Boulevard in Costa Mesa. At approximately 9:10 p.m., a third robbery occurred at a Baskin-Robbins store on Newport Avenue in Tustin. Finally, at approximately 10:00 p.m. police received a 911 call from a Baskin-Robbins store in Laguna Beach. Responding police officers discovered Simindokht dead of a gunshot wound and her husband, Firooz, bleeding from a gunshot wound in his shoulder. What follows is an account of the murder and robberies with an emphasis on the circumstances surrounding the eyewitnesses' initial view of the perpetrator and their subsequent descriptions and identification of him.

At approximately 8:38 p.m., Melanie Williams, an employee of Conroy's Flowers on Harbor Boulevard in Costa Mesa, noticed a male customer enter the store. Williams described the man as Hispanic, with short, slicked-back black hair, and brown eyes. She thought he was in his early to mid-20's, around 5 feet 10 inches in height, and weighing between 140 and 170 pounds. She told investigators the man wore a long black trench coat, tan pants, a tan scarf and blue Nike tennis shoes. She stated he had tattoos on his neck, possibly letters, and a teardrop tattoo just below his left eye. At the time, Williams thought the man was dressed "inappropriately for the weather," which she described as "warm." According to Williams, the man "approached the cash register and very politely said, 'Will you open the register, please.'" Williams did not immediately respond and the man repeated his statement and pointed a gun at her. Williams then opened the register and the man stepped around the counter, reached into the register, and grabbed some money. On his way out of the store, he grabbed a balloon from one of the displays.

Heather Arensdorf, another employee, testified that she had just returned from outside the store when she noticed a Hispanic man with a very short haircut standing behind the counter. The man told her to "stop, stay" and pointed a gun at her. As he left the store, Arensdorf noticed a tattoo on the back of his neck that "looked like a name of something, of someone or something."

David Byrnes was outside the Costa Mesa Conroy's Flowers when he noticed a Hispanic man wearing a black trench coat walk into the store. He watched the robbery and saw the man grab a balloon on his way out of the store. Byrne saw a teardrop tattoo on the man's face below his right eye and several tattoos on his neck. He described the man as 5 feet 6 or 8 inches tall and weighing around 160 pounds.[1]

Within minutes of the Costa Mesa Conroy's Flowers robbery, Tyler Quin and Justin Miller, employees of the Blockbuster music store on Harbor Boulevard in Costa Mesa, were the victims of another robbery. They were standing together behind the center cash register counter when Quin turned around and saw Miller removing the drawer from his register. Quin then noticed a man pointing a gun at Miller. The man took the money from Miller and put it in a bag. Quin described the man as a Mexican-American, in his late 20's or early 30's, with a mustache and tattoos on his neck. The tattoos were in a script-type style and appeared to be letters. Miller described the man as a Latin male with a thin moustache, dark eyes, and short black hair, wearing a black jacket and khaki pants. He also noticed an Old-English-style script tattoo on the man's neck.

At approximately 9:00 p.m., Erik Leon was serving a customer at the Baskin-Robbins store on Newport Avenue when he noticed a Hispanic man with dark, short hair and tattoos on his neck, wearing a long black trench coat and holding a gun. He tapped Richard Alkema, another employee, on the shoulder and said, "We're being robbed." Alkema described the man as having dark hair, a mustache, and tattoos on his neck and below his right eye. The man was wearing a long black coat and pointing a gun at a third employee, Josh Egan.

Egan had his head down typing an order into the cash register when he felt the barrel of a gun pressed to his forehead. He jumped back and looked at the robber for "a split second" before putting his head back down. Egan described the man as Hispanic, with short dark hair and a mustache, in his 20's, and a little taller than 5 feet 10 inches. Egan thought he looked "very skinny, skin and bones." He and Alkema noticed a teardrop tattoo under the man's left eye. They said the man wore a black coat and had tattoos on both sides of his neck. Egan and Alkema described the tattoos on the man's neck as being made in an "old English type of writing."

Steve Snider, a customer at the Tustin Baskin-Robbins store, described the robber as a male Hispanic, 5 feet 7 or 8 inches tall, with dark features and a

---

[1] A crime scene investigator found one fingerprint at the Costa Mesa Conroy's Flowers. The print did not match prints obtained from either suspect in this case.

tattoo on the left side of his neck. He caught a glimpse of the tattoo and thought it was a large "A" in some type of calligraphy script. The man held a black gun. Adriana Crandall attempted to enter the store as the robber exited. He pushed her with his right hand and held a gun in his left. She described him as a Hispanic man with a teardrop tattoo under his left eye and another tattoo on his neck. She said the man wore a black knit cap, black coat, black pants and black shoes.

At 9:40 p.m., Elizabeth Gerron, and her girlfriend, Rachel Shaw, entered the Laguna Beach Baskin-Robbins store. Simindokht unlocked the bathroom door for Shaw and returned to the counter area. Firooz looked up from mopping the floor and saw a man with a gun standing on the other side of the counter from his wife. The man looked at Firooz and said, "Give me the money." Suddenly, the man and Simindokht were struggling with each other. Firooz yelled out, "Call the police." The man said, "No, no, don't call the police." Simindokht pulled away from the man, who then knocked the register to the ground and shot her in the neck. Firooz testified, "She wanted to open the register, but when he attacked, they started fighting. She pulled herself back. [¶] . . . [¶] And this guy pointed the gun and shot it."

Firooz ran around the counter and hit the man in the neck with the mop handle. The man pointed the gun at Firooz's head. Firooz turned away from the gun and was shot in the shoulder. Firooz fell to the ground and the man escaped. Firooz described the man as white, with a teardrop tattoo under his eye, tattoos on his neck, and wearing a long black coat. He described the tattoo on the man's neck as "like a seahorse."

Elizabeth Gerron noticed a man wearing a long black coat enter the store and draw a small black gun from his right coat pocket. Gerron crouched down and moved into the store's back office to call 911. As she made the call, she heard screaming, a loud crash and two gunshots.

Orange County District Attorney's Office Investigator Hector Pantoja was working for the Laguna Beach Police Department in February 1995 when he was called to the crime scene. Pantoja and another officer found nine-millimeter shell casings outside the store. A nine-millimeter projectile was found in Simindokht's clothing. Pantoja was getting a detailed description of the assailant from Gerron when he received information about three other robberies that had occurred earlier in the evening.

Pantoja requested and received the video surveillance tape from the Tustin Baskin-Robbins store robbery. He showed Firooz and Gerron a still photograph made from the video surveillance tape. They identified the person in the picture as the person who had killed Simindokht and shot Firooz.

*Rodriguez becomes the suspect*

In early March 1995, the television program "America's Most Wanted" aired a segment on the series of robberies. Doris Duenas, Rodriguez's aunt, saw the program and contacted police. As a result of this tip, Pantoja learned that Rodriguez was on parole from Riverside County. Pantoja obtained a photograph of Rodriguez from the Santa Ana Police Department and he assembled a six-person photographic lineup with Rodriguez's picture in the number four position. He showed this photographic lineup to Firooz on March 17. Firooz did not make a positive identification. The next day, Gerron viewed the same photographic lineup. She stated, "It's either 3 or 4." However, she could not positively identify anyone.

Tustin Police Department Investigator Tom Tarpley assembled another six-person photographic lineup with Rodriguez in the number four position to Alkema, Egan, and Snider. Alkema stated Rodriguez looked "the most familiar." Egan positively identified Rodriguez. Snider stated Rodriguez and another person most closely resembled the robber. A few days later, Tarpley showed Crandall the same photographic lineup he had shown to Alkema, Egan, and Snider. Crandall positively identified Rodriguez.

Costa Mesa police officers showed Miller, Quin, and Williams another six-person photographic lineup containing Rodriguez's picture. None of these witnesses made a positive identification.

Pantoja then learned that Rodriguez had been arrested in Chiloquin, Oregon. Pantoja traveled to Oregon and interviewed Rodriguez and Janet Samson Rodriguez, Rodriguez's then girlfriend. Samson told Pantoja she and Rodriguez had moved from California to Oregon on February 15. She provided him with telephone bills showing calls made to California from the home where they lived. She also told Pantoja that Rodriguez had not lived at home during the week prior to their departure for Oregon.

Rodriguez told Pantoja he had never committed robbery or any other violent crimes in Orange County. He claimed he and Janet Samson moved to Oregon around January 1, 1995. Rodriguez told Pantoja it took him 16 hours to drive to Chiloquin, Oregon from Corona, California. Later, Rodriguez admitted he had committed two robberies in Riverside County, one at a gas station and the other at a Dairy Queen. He told Pantoja, "You guys want to screw me. I didn't kill anybody."

Pantoja and another detective searched a 1984 Chevrolet Camaro, which had been parked in a garage since the couple arrived in Oregon. He discovered receipts for auto parts and supplies in the car. On February 21,

Rodriguez and Janet Samson appeared at the Klamath County Community Health Center in Klamath Falls, Oregon, at approximately 9:00 a.m. On February 22, a Klamath County sheriff's deputy saw Rodriguez and Samson driving a 1984 Camaro and ran a records check on the license plate and registration. Pantoja drove from Laguna Beach to Riverside then to Klamath Falls, Oregon, a distance of approximately 640 miles, to reenact the route Rodriguez might have taken, assuming he committed the Laguna Beach murder. Pantoja concluded Rodriguez "had ample time to commit the robberies and murder, drive to his residence, gather his belongings and pick up Janet Samson, drive to Oregon, arriving in time for Samson's 9 o'clock appointment at the welfare office . . . in Klamath Falls."

After his arrest, local area newspapers published Rodriguez's picture and a story linking him to the murder in Laguna Beach and the Tustin Baskin-Robbins store robbery. On March 29, various law enforcement agencies organized a live lineup with Rodriguez. When Rodriguez entered the room, Firooz started muttering, "That son-of-a-bitch. That son-of-a-bitch." He identified Rodriguez as the man who killed his wife and shot him in the shoulder. Gerron initially picked another person, but later told Pantoja she had made a mistake and really recognized Rodriguez. She admitted that she had seen Rodriguez's picture in the Orange County Register before she participated in the live lineup.

Williams did not identify anyone, but said someone other than Rodriguez looked "the most similar, but [was] not the right person." Snider stated Rodriguez could possibly be the robber. He asked to see the suspects' tattoos, but the officers would not permit it. Miller thought Rodriguez and another man looked familiar, but he could not positively identify anyone. Leon and Quin did not identify anyone. Crandall and Egan did not attend this lineup, but they both identified Rodriguez at a second live lineup. Crandall and Egan commented that he looked heavier than they remembered.

In October 1995, Rodriguez participated in a videotaped reenactment of the Tustin Baskin-Robbins store robbery. Law enforcement officers made a still photograph from the videotape and compared it to the still photograph made from the store's February 20 videotape.[2] Based on this comparison, charges against Rodriguez in Orange County were dismissed and he was transported to Riverside to face robbery charges in that county.

---

[2] See appendix A, *post*, page 542, for a scaled reproduction of the photographic comparison. The top photograph was made from the February 20, 1995 videotape and the bottom photograph from the videotape of Rodriguez's October 1995 reenactment.

*Garcia is identified as a suspect*

In 2000, five years after the Roshdieh robbery and homicide, Robert Romaine, a retired police officer working on cold case files was assigned to the case. Relying on descriptions of the perpetrator's distinctive neck tattoo, Romaine searched a law enforcement database containing records of convicted criminals with tattoos. Garcia's name surfaced in connection with his detention at the Mexican border on February 28 and March 22, 1995. Border authorities had arrested Garcia and photographed his tattoos. Romaine learned that Garcia had been detained with a woman named Nydessa Whitaker. Based on that information, Romaine contacted Whitaker.

In September 2000, Romaine and members of the Laguna Beach Police Department talked to Whitaker at her federal probation officer's office. Whitaker was on federal probation following a conviction for distributing crack cocaine. Although Whitaker had faced a possible life sentence in the case, she received probation by agreeing to testify against her codefendants. Romaine told Whitaker he was interested in talking to her about Gilbert Garcia. Romaine testified Whitaker "immediately swelled up in her eyes, placed her head down quite noticeably and muttered that she knew that one day the police would come and ask her about a killing at Baskin-Robbins store."

Initially, Whitaker implicated Garcia and another woman in the crimes. Romaine reinterviewed Whitaker several times during the next few months. Finally, in February 2001, Whitaker admitted her own involvement in a series of four robberies that ended with a murder.

Romaine obtained several photographs of Garcia from the California Department of Corrections depicting numerous tattoos on his neck, back, hands and face. Garcia has a cluster of three dots tattooed under his left eye, the name "Consuelo" tattooed on the front of his neck and the word "Longo" tattooed on the left side of his neck.

On October 24, 2001, Pantoja and a Laguna Beach investigator compiled another six-person photographic lineup including Garcia's and Rodriguez's pictures.[3] This photographic lineup was shown to eyewitnesses from the Laguna Beach robbery and murder and the three other February 20, 1995 Orange County robberies.

Firooz identified Garcia and wrote, "I never forget those two eyes, that son of a bitch." Gerron also identified Garcia. Williams tentatively identified

---

[3] See appendix B, *post*, page 543 for a scaled reproduction of the photographic lineup with Garcia's picture designated number two and Rodriguez's picture number six.

Garcia. Arensdorf was unable to identify anyone. Miller stated Rodriguez looked "most like" the man who robbed the store, but he did not make a positive identification. Snider did not make an identification. Crandall identified Garcia. Alkema identified three people as closely resembling the perpetrator—Garcia, Rodriguez, and a third person. Leon did not positively identify anyone, but he said Rodriguez "really struck [him]," and Garcia's picture "was the first thing that popped out of the page." Egan identified Rodriguez. While he noticed the person he picked did not have a teardrop tattoo under his eye, he explained that one of the police detectives had told him tattoos could be removed. Quin did not positively identify anyone, but he thought that someone other than Garcia or Rodriguez could have possibly been the assailant. He also stated Rodriguez resembled the robber but appeared younger.

In June 2002, the district attorney charged Garcia with the murder of Simindokht Roshdieh, the attempted murder of Firooz Roshdieh, and of being a convicted felon in possession of a firearm. Special circumstances allegations made Garcia eligible for the death penalty.

### Garcia's trial

Garcia's trial began in October 2003. The prosecution called numerous witnesses, including most of the eyewitnesses and law enforcement officers involved in the investigation. However, the pivotal prosecution witnesses were Whitaker, an admitted accomplice to the murder and robberies who testified under a grant of immunity, and the former suspect in the crimes, Rodriguez.

#### a. Whitaker's testimony

Whitaker testified that she met Garcia in 1994 while she was living in Long Beach, California, and selling methamphetamine. Initially, Garcia was just one of her customers, but the relationship changed. Whitaker testified, "We spent many days together getting high, and I fell in love." Whitaker also worked as a dispatch agent for an escort service. Garcia became a driver for the same escort service. As she explained, "Whenever we received a call and the girls needed a ride and there was more than two gentlemen at the location, Gilbert would drive the lady there and he would stand by to make sure that nothing would take place that was illegal or anything to harm the young lady."

Eventually, Whitaker and Garcia moved into Garcia's mother's home. After about six months, they moved to a hotel in Long Beach. Whitaker continued to sell methamphetamine from the hotel, and she and Garcia ingested methamphetamine on a daily basis. Whitaker snorted the drug while Garcia injected it.

Whitaker testified that in late February 1995, she and Garcia left Long Beach "to commit some robberies." She stated they went to a Conroy's Flowers, two Baskin-Robbins store, and a Blockbuster. Although she drove the car, Whitaker could not recall where the stores were located. After one of the robberies, Garcia returned to the car with a balloon. At the Blockbuster, he returned with cash. The first Baskin-Robbins store was close to the Blockbuster.

After three robberies, Garcia had collected approximately $900. He and Whitaker argued about whether he should commit another robbery. Garcia directed her to get on the freeway. She drove on the freeway for a while before exiting on to a winding road. Eventually, they entered what she described as a small town. She parked the car and Garcia got out. When he returned, Garcia said, "Go, go. Hurry up and let's go." He reclined his seat, turned his back to Whitaker, and curled-up in the fetal position as she drove away. Whitaker thought he was crying. Garcia told her he wanted to get some methamphetamine. Whitaker asked Garcia what had happened. He told her he had "shot a man." She testified Garcia "said when he asked the lady to open the register that he went and reached into the register and she slammed the drawer and it snatched his finger, and he said the gun went off and he shot the man."

Whitaker drove Garcia to a friend's home. She returned to their hotel room, packed her things, and drove to a minister's home. She claimed she told the minister that she had been involved in a robbery and murder. Whitaker confessed that she had driven the car. Later, Garcia, Whitaker, and Garcia's friend got high and talked about running to Mexico. The next day, Garcia and Whitaker drove to Temecula. Whitaker returned to Orange County the following day to attend a parenting class.

Whitaker thought Garcia was armed with a pellet gun during the robberies. Later, she saw that he had a black nine-millimeter handgun. Eventually, Garcia and Whitaker fled to Mexico. For some period of time, they stayed in a Mexican hotel and made frequent trips across the border for money and for Whitaker to attend her parenting class. They were twice detained at the border, where Garcia was arrested and photographed. Customs officials found a pellet gun under the passenger's seat of their car.

In April 1995, Whitaker and Garcia decided to marry and they lived together for approximately one year following the murder. In a subsequent conversation, Garcia told Whitaker, "I killed a woman once. I wanted to kill another one." Whitaker read an article about the murder in a local newspaper. The article reported that the Roshdiehs' son said he wanted to carve his mother's face in the killer's back.

Five years later, police officers questioned her about the crimes. She initially denied any involvement in the Laguna Beach murder. She told investigators someone else had driven Garcia to the robberies. However, when she was interviewed a couple of months later, Whitaker claimed that she decided to tell them the truth. Eventually, the police asked her to cooperate with them. She admitted lying to get what she wanted. She also admitted to writing bad checks while she was in the California Witness Protection Program. She testified that she feared Garcia or other members of his criminal street gang might retaliate if she spoke to police. On one occasion, while they were staying in Temecula, Garcia had pointed a gun at her.

### b. *Rodriguez's testimony*

Rodriguez testified that he was convicted of felony possession of a firearm in 1993 and released on parole in November 1994. He committed two robberies in Riverside County in January 1995. Rodriguez denied committing any other robberies between November 1994 and March 1995.

Around February 10, 1995, Rodriguez separated from Janet Samson for four days and went to live with a friend named "George" in Santa Ana. On February 15, 1995, he and Samson left California and moved to Chiloquin, Oregon. On February 20, he made a telephone call to his sister in Garden Grove. Rodriquez discovered he was a suspect in the Laguna Beach murder by watching the television program, "America's Most Wanted." He told Pantoja he had not committed any robberies in Orange County and claimed he had never been to Laguna Beach. He denied hiding the Camaro they drove to Oregon and testified he parked it in a garage because the power steering was broken. The receipts found in the Camaro were for various auto parts and supplies purchased on February 14, 1995, at stores in Corona, California.

Rodriguez denied confessing to the crime while incarcerated in the Orange County jail. He denied telling another inmate that he shot the lady because somebody came out of the back of the store and surprised him. He denied having a friend named "Mark," or that he had admitted being the driver for the Laguna Beach crime. He also denied telling his aunt, Doris Duenas, he committed the murder and denied showing her a pistol, wrapping it in a red blouse, or giving the gun to his sister to dispose of it. He claimed it was not possible for his aunt to have seen him in California on February 20, 1995. But he admitted he and Duenas were heroin addicts.

Rodriguez showed the jury several of his tattoos. He has the name "Janet" in cursive writing on the left side of his neck, two roses on the right side of his neck, and the word "Santa Ana" tattooed on the back of his neck. He has

letters tattooed on eight of his 10 fingers. He does not have any tattoos on his face. He claimed to have used a pellet gun and pellet rifle to commit the Riverside robberies.

### c.   *Janet Samson and Sally Camino*

Janet Samson testified that she married Rodriguez in December 1995. After Rodriguez's release from prison in 1994, they lived with Janet's sister, Barbara Hood, and her brother-in-law, Joseph Hood. They moved to Chiloquin, Oregon, on February 15, 1995, to care for Janet's mother, Sadie Samson. Samson called her sister Barbara at her place of employment in Orange County from her mother's home. She also contacted social services in Riverside. The parties stipulated that on February 17, 1995, at 8:49 a.m., a three-minute call was made from Sadie Samson's telephone number to the Riverside County Department of Social Services. Another five-minute call was made at 9:00 a.m.

Sally Camino, Rodriguez's sister, testified that she became aware of her brother's arrest in March 1995. On March 26, someone identifying herself as Rodriguez's sister told a Laguna Beach Police dispatcher her brother had been in Oregon at the time of the shooting, and that she had received a telephone call from him on February 20.

### d.   *Defense witnesses*

Ricardo Camargo testified that he was incarcerated in the Orange County jail with Rodriguez in May 1995. He testified Rodriguez made the following statement: "He said that they got him under investigation and that they probably wouldn't get him for the murder, because he was much too slick for that, and he did it, and he's going to get away with it." Rodriguez explained that he had "panicked, shot somebody, ran out, and got in the car around the corner." Camargo told Pantoja what Rodriguez had said, but stated that he received no consideration for his testimony.

Pastor Daniel Washington testified that he recalled providing a place for Whitaker to stay in 1995. However, he did not recall her mentioning that she had been involved in a murder and robbery with her boyfriend.

Doris Duenas testified that in February 1995 Rodriguez and a friend named Mark talked to her about doing a robbery in Santa Ana. Rodriguez had a nine-millimeter gun at the time. They discussed another robbery Rodriguez had committed and Rodriguez claimed he could not commit any more robberies in Riverside County. Duenas remembered that Rodriguez was dressed in a long, dark blue denim jacket, blue Levi pants, and white tennis

shoes. Rodriguez also told her he had been to Laguna Beach and that he intended to commit a robbery in Laguna Beach.

On February 20, 1995, Rodriguez and Mark left her home around 7:00 p.m. and returned between 11:30 and midnight. Duenas, Rodriguez, and Mark ingested heroin before they left and after their return. Sometime later, Rodriguez told Duenas he had to go to Oregon because he was a suspect in a couple of robberies. Duenas testified that she contacted police after the airing of the "America's Most Wanted" program. However, the parties agreed she talked to an investigator before the program aired. Duenas claimed Rodriguez's mother had disposed of the gun. Duenas admitted she has a criminal record and was addicted to heroin. She also testified she was afraid Rodriguez would retaliate against her. The parties agreed her first mention of Rodriguez's claim to have been in Laguna Beach to plan a robbery was in October 1995, while she was incarcerated in the Riverside County jail.

## II

## DISCUSSION

Garcia filed a pretrial motion to admit evidence of a statement purportedly made by Anissa May Calderon, a former police officer, to Pantoja during his investigation in Oregon. According to Garcia's moving papers and his counsel's offer of proof, Calderon, deceased at the time of trial, told Pantoja that she had met Rodriguez in a bar in Portland, Oregon. During their conversation, Rodriguez admitted that he committed a robbery and homicide in Laguna Beach. Counsel conceded Calderon's statement to Pantoja constituted hearsay with no recognized exception to permit its introduction at trial. However, relying on *Chambers v. Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038] (*Chambers*), counsel argued, "The hearsay exclusionary rule must give way if the court finds the hearsay to be reliable." The court took the matter under submission. It did not conduct an Evidence Code section 402 hearing to establish facts bearing on the statement's reliability.

The following day, the court ruled as follows: "I also have reviewed the *Chambers* case concerning the admission of the deceased witnesses' statements concerning a third—or concerning the statements of Mr. Rodriguez. [¶] As I mentioned yesterday, there is a case called *People v. Ayala*, and that is at 2[3] Cal.4th 225. The California Supreme Court discussed introduction of statements attributed to deceased witnesses by a defense investigator. The question is whether or not there was a constitutional or state law right to present exculpatory but unreliable hearsay evidence that is not admissible under any statutory exception to the hearsay rule. Their holding was there

was not. There was a discussion of *Chambers v. Mississippi*. The defendant Ayala raised the same points that are being raised by Mr. Garcia in this case. [¶] The Supreme Court went onto say that defendant cites no law of this state, whether constitutional, statutory, or decisional, that would have required the trial court to permit the investigators to testify about Castro's and Vejar's statements. [¶] They also discussed *Chambers*. I did read *Chambers*. *Chambers* involved a situation in which I didn't quite understand the concept of vouching, but apparently Mississippi had some evidentiary rule that precluded the defense from introducing prior inconsistent statements, not only of the witness they called, but of preventing them from calling witnesses to impeach that witness with prior inconsistent statements, and I think it's factually distinguishable from what is involved in this case. [¶] And also the Supreme Court cited other U.S. Supreme Court cases that explain that *Chambers* is closely tied to the facts in the Mississippi evidence law, that it considered *Chambers* as not authority for the result defendant urges here. And I agree with the Supreme Court. I don't think that there is anything in *Chambers*. [¶] Frankly, it seemed goofy now when you look back and see what Mississippi was doing that you couldn't even produce prior inconsistent statements of a witness that you had called, nor bring in witnesses to introduce those statements. [¶] . . . [¶] I understand your position, however, it's hearsay on hearsay with no legally recognized exception."

On appeal, Garcia contends Rodriguez's statement admitting he committed a robbery and murder in Laguna Beach, which was made to Calderon in an Oregon bar and recounted to Pantoja during his investigation, was admissible through Pantoja's trial testimony. He asserts the trial court should have held an evidentiary hearing to determine if the circumstances under which Calderon's statement was made provided some level of assurance of its reliability. Garcia contends Rodriguez's confession to a retired police officer and repeated to the investigator of the crime was vital to his case. Conceding Calderon's statement is hearsay, Garcia argues exclusion of this single piece of exculpatory evidence violated his right to due process.

The right of a criminal defendant to due process under similar circumstances was carefully examined in *Chambers, supra,* 410 U.S. 284. There, the defendant was charged with murder after a fracas between two police officers and 20 to 25 men resulted in the shooting death of one of the officers. At trial, defense counsel sought to establish the culpability of a third party, Gable McDonald. McDonald had left town for some months after the incident, but he later returned and gave a sworn statement confessing to the murder in Chambers' attorneys' offices. McDonald repudiated his confession at the preliminary examination and at trial. He also denied being at the scene of the crime and claimed he had been down the street drinking beer with a friend, Berkley Turner. Defense counsel attempted to prove McDonald had admitted

responsibility for the crime on four occasions, once when he gave the sworn statement and three other times in private conversations with friends.

As the Supreme Court noted, Mississippi's rules of evidence presented an insurmountable obstacle to the admission of the defense evidence. Specifically, the hearsay rule as applied in Mississippi and Mississippi's so-called voucher rule prevented defense counsel from cross-examining McDonald or presenting witnesses that would have discredited his testimony.[4] Despite the limitations placed on counsel, Chambers' attorney managed to "chip[] away at the fringes of McDonald's story" through the admissible testimony of other witnesses. (*Chambers, supra,* 410 U.S. at p. 294.) Nevertheless, the court stated, "Chambers' defense was far less persuasive than it might have been had he been given an opportunity to subject McDonald's statements to cross-examination or had the other confessions been admitted." (*Ibid.*)

To assess the harm done in Chambers's case, the Supreme Court analyzed the scope of due process under the Fourteenth Amendment as it applies to the Sixth Amendment right to confront adverse witnesses. The court stated, "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process. Mr. Justice Black, writing for the Court in *In re Oliver,* 333 U.S. 257, 273 [92 L.Ed. 682, 68 S.Ct. 499] (1948), identified these rights as among the minimum essentials of a fair trial: [¶] 'A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.' [Citations.]" (*Chambers, supra,* 410 U.S. at pp. 294–295.)

The Supreme Court first criticized Mississippi's voucher rule, concluding, "The availability of the right to confront and to cross-examine those who give damaging testimony against the accused has never been held to depend on whether the witness was initially put on the stand by the accused or by the State. We reject the notion that a right of such substance in the criminal process may be governed by that technicality or by any narrow and unrealistic definition of the word 'against.' The 'voucher' rule, as applied in this case, plainly interfered with Chambers' right to defend against the State's charges." (*Chambers, supra,* 410 U.S. at pp. 297–298.)

---

[4] As described in the opinion, Mississippi followed a common law rule that a party may not impeach his own witness. "The rule rests on the presumption—without regard to the circumstances of the particular case—that a party who calls a witness 'vouches for his credibility.' [Citation.]" (*Chambers, supra,* 410 U.S. at pp. 295–296.)

■ The Supreme Court then addressed the hearsay rule. "The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury. [Citation.]" (*Chambers, supra,* 410 U.S. at p. 298.) Noting the numerous exceptions to the hearsay rule, the court focused on the exception applicable to declarations against interest. (*Id.* at p. 299.) Mississippi law did not recognize an exception to the hearsay rule for declarations against penal interest, an exception which is recognized in California. (Evid. Code, § 1230.)[5] While the court questioned the rationale for strict limitation of the declaration against interest exception to pecuniary interests, it did not decide the validity of this limitation in *Chambers*. Instead, the court determined McDonald's statements were "originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability[;]" therefore, the hearsay rule must yield to the accused rights to confrontation and to present a defense. (*Chambers, supra,* 410 U.S. at pp. 300, 302.)

The court examined several factors bearing on the reliability of McDonald's various statements: "First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case . . . . Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest. . . . Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury. [Citation.] The availability of McDonald significantly distinguishes this case from the prior Mississippi precedent, *Brown v. State* [(1991) 99 Miss. 719 [55 So.

---

[5] Evidence Code section 1230 provides, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

961]], and from the *Donnelly*-type[6] situation, since in both cases the declarant was unavailable at the time of trial." (*Chambers, supra,* 410 U.S. at pp. 300–301, fn. omitted.)

In *Green v. Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, S.Ct. 2150], the defendant and Carzell Moore were prosecuted for the rape and murder of Teresa Carol Allen. During the penalty phase of Green's trial, Green attempted to prove he had not killed Allen or been present during her death, although the trial evidence suggested he had helped Moore kidnap her and participated in the rape and murder. Green sought to introduce the testimony of a third person that Moore had claimed responsibility for the murder, shooting Allen twice after sending Green on an errand. The trial court excluded the testimony of the third person on hearsay grounds. Citing *Chambers, supra,* 410 U.S. 284, the Supreme Court found the exclusion of Moore's statement to a third person violated the Due Process Clause of the Fourteenth Amendment. (*Green v. Georgia, supra,* 442 U.S. at p. 97.)

The Supreme Court decided Moore's statement to the third party was "highly relevant to a critical issue in the punishment phase of the trial, [citations] and substantial reasons existed to assume its reliability." (*Green v. Georgia, supra,* 442 U.S. at p. 97.) The court cited the following as its "substantial reasons:" (1) Moore made his statement spontaneously to a close friend, (2) there was ample evidence corroborating the confession, (3) it was made against Moore's interest, and (4) Georgia had used the statement in Moore's penalty trial to argue for his death. (*Ibid.*) The court reversed the judgment, concluding, "[i]n these unique circumstances, 'the hearsay rule may not be applied mechanistically to defeat the ends of justice.' [Citation.]" (*Ibid.,* fn. omitted.)

The California Supreme Court addressed whether a defendant had either a constitutional or state law right to present exculpatory but otherwise inadmissible hearsay evidence in a death penalty case in *People v. Ayala* (2000) 23 Cal.4th 225 [6 Cal.Rptr.2d 682, 1 P.3d 3]. During the guilt phase trial, defendant moved to introduce the hearsay statements of two individuals who were interviewed by defense investigators but died before trial. According to Ayala's moving papers, these two witnesses made statements that bolstered his claim that unknown assailants had committed the crimes and they had provided evidence bearing on the credibility of a key prosecution witness. The trial court concluded the statements lacked any indicia of trustworthiness or reliability and with respect to one of the witness's statements appeared to be cumulative of other evidence. (*Id.* at p. 268.)

---

[6] *Donnelly v. United States* (1913) 228 U.S. 243 [57 L.Ed. 820, 33 S.Ct. 449].

On appeal, Ayala argued the trial court's ruling violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under state law. The California Supreme Court rejected these arguments and affirmed the judgment. (*People v. Ayala, supra*, 23 Cal.4th at pp. 269–270.) As to state law error, the court concluded the statements were hearsay without any applicable exception and no indicia of reliability. (*People v. Ayala, supra*, 23 Cal.4th at p. 269.) While acknowledging the fundamental right of an accused to present defense witnesses, the court emphasized the validity of established rules of evidence and procedure that apply when the accused exercises that right. (*Ibid.*) The court acknowledged *Chambers, supra*, 410 U.S. 284, but noted that both the California and United States Supreme Courts "have explained that *Chambers* is closely tied to the facts and the Mississippi evidence law that it considered." (*People v. Ayala, supra*, at p. 269) Ultimately, the court found significant the fact that the statements were given to a person seeking exculpatory evidence, not spontaneous, there was no opportunity for cross-examination, and the statements were not made under circumstances suggesting they were reliable. (*People v. Ayala, supra*, 23 Cal.4th at p. 270.)

■ In this case, Rodriguez purportedly made an incriminating statement to a total stranger in a bar in Portland, Oregon. According to the prosecutor, Calderon contacted "America's Most Wanted" and said someone named Hernandez claimed he "murdered somebody somewhere." The prosecutor stated Pantoja had interviewed Calderon and showed her a photographic lineup that included Rodriguez's picture but she was unable to make a positive identification. Defense counsel did not dispute this recitation of the facts, but stated "that leaves out a fact." No further explanation of the omitted fact was given. Based on the facts provided, Calderon's statement to Pantoja lacks reliability. Garcia seems to argue a statement made by a retired police officer to an investigating officer is inherently reliable. ■ However, *Chambers* does not stand for the proposition that due process requires admission of *any* hearsay statement made under circumstances demonstrating some trustworthiness or reliability.

This case is further distinguished from *Chambers, supra*, 410 U.S. 284, by the fact Calderon was decidedly unavailable for cross-examination. Witness availability was an important factor in the analysis of the United States and California Supreme Courts. Finally, as in *People v. Ayala, supra*, 23 Cal.4th 225, evidence of Rodriguez's statement to Calderon, had it been introduced through Pantoja's testimony, would have been cumulative of other evidence adduced at trial. Camargo and Duenas testified under oath that Rodriguez admitted committing the crime.

Of course, the circumstances surrounding Calderon's repetition of Rodriguez's statement were not the subject of sworn testimony because the court did not

conduct an evidentiary hearing. However helpful an evidentiary hearing might have been, the court did not abuse its discretion by not holding one. (See *People v. Williams* (1997) 16 Cal.4th 153, 196–197 [6 Cal.Rptr.2d 123, 940 P.2d 710].) Defense counsel's offer of proof failed to include any particular reason for the court to take evidence. During argument, defense counsel stated, "I'm assuming that the court's going to need to hear Investigator Pantoja." But counsel did not object on this ground the following day when the court issued its ruling. Instead, counsel merely asserted the court would conclude Pantoja "accurately described the statement made to him, which would have described a declaration against penal interest by Rodriguez." Based on these representations, we find no error in the court's failure to conduct an evidentiary hearing.

However, assuming error, it was harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 306–307 [113 L.Ed.2d 302, 11 S.Ct. 1246]; *Chapman v. California* (1967) 386 U.S. 18, 36 [17 L.Ed.2d 705, 7 S.Ct. 824] [constitutional error does not automatically require the reversal of a conviction].) At the beginning of the trial, defense counsel stated, "This is a case where the [police] and the D.A.'s office thought they had the right person. . . . His name is Rodriguez. At some point they dismissed the case against Rodriguez. Why they did is irrelevant to the process, but then they arrested Mr. Garcia. [¶] . . . [¶] This is going to be . . . a two-defendant case. They're going to try Mr. Garcia, and we're going to try Mr. Rodriguez." To this end, Garcia's attorneys presented ample evidence in support of his identity defense. The court granted wide latitude in cross-examination of the various prosecution witnesses and permitted Garcia to present witnesses in support of his claim of innocence. No one questioned Rodriguez about his alleged barroom declaration to Calderon. Nevertheless, he underwent extensive cross-examination regarding other incriminating statements made to Carmago and Duenas.

As noted, this was a thought-provoking case. We have included two guilt phase trial exhibits to highlight the uncanny resemblance of the two men eyewitnesses positively identified as the lone perpetrator of these crimes. Add the testimony of witnesses with questionable veracity, including the testimony of an uncharged accomplice to the crimes, and the question of the perpetrator's actual identity was hardly a forgone conclusion. Nevertheless, after a review of the entire record, we conclude beyond a reasonable doubt the exclusion of a single inadmissible hearsay statement did not deprive Garcia of a fair trial.

## III

## DISPOSITION

The judgment is affirmed.

Rylaarsdam, Acting P. J., and Ikola, J., concurred.

A petition for a rehearing was denied December 27, 2005, and appellant's petition for review by the Supreme Court was denied March 15, 2006, S140134. George, C. J., did not participate therein.