**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KRISTI LYN LUNBERY,
       *Petitioner-Appellant,*

v.

TINA HORNBEAK, Warden;
ATTORNEY GENERAL,
       *Respondents-Appellees.*

No. 08-17576

D.C. No.
2:07-cv-01279-GGH

OPINION

Appeal from the United States District Court
for the Eastern District of California
Gregory G. Hollows, Magistrate Judge, Presiding

Argued and Submitted
January 15, 2010—San Francisco, California

Filed May 25, 2010

Before: John T. Noonan, Michael Daly Hawkins and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Noonan;
Concurrence by Judge Hawkins

7427

**COUNSEL**

Juliana Drous, San Francisco, California, for the petitioner-appellant.

Barton Bowers, Deputy Attorney General, Sacramento, California, for the respondents-appellees.

**OPINION**

NOONAN, Circuit Judge:

Kristi Lyn Lunbery appeals the denial by the district court of her petition for a writ of habeas corpus. We reverse the judgment of the district court and remand with directions to issue the writ.

FACTS

*The Crime.* At approximately noon on Friday, April 17, 1992, Charlie Bateson (Charlie) was discovered dead. He had been shot in the head with a single bullet discharged four to six inches from his head. His death by violence had been caused by another person. The time of his death is not established by the record on appeal.

*The Investigation.* A neighbor, Belinda Strickland, discovered the body in a bed in Charlie's home in Burney, Shasta County, California. The Shasta County Sheriff was notified. Detectives from his office examined the house. Blood had splattered on the floor and wall of the bedroom and on the

outside of the door frame leading to a hall. No weapon was found. No bloodstained clothes were found. No signs were found of any clothes or area having been recently washed. Fingerprints, when they were taken, were of the present and recent tenants, plus some unidentified prints and an unidentified palm print. A medical examiner performed a field investigation at the house and four days later conducted an autopsy. The house was unlocked. It was the last house on a cul-de-sac, and the detectives found footprints and tire tracks in the wooded area at the end of the street. The detectives also found a note to Charlie on the refrigerator from his wife, telling him that she was taking their two daughters to go shopping in Redding and would be back by 1 p.m. or so.

Sheriff's officers found Charlie's wife, Kristi, at the Mt. Shasta Mall in Redding with her two children and her grandfather. She was visibly upset by the terrible news the detectives brought her. She immediately consented to a search of her car, parked nearby. The detectives found no bloodstains and no weapon. Kristi herself had no apparent bloodstains on her clothes.

The detectives escorted Kristi to the Sheriff's office where she gave an account of her day. Charlie worked on the swing shift, 5 p.m. to 3 a.m., at Sierra Pacific Mills. The couple had two children, Kayla, aged 3½, and Kelsey, aged about four months. The children went to bed in the single bedroom in the small house. Kristi greeted Charlie when he returned from work, and they talked to about 3:30 a.m. Then, as ususal, they went to sleep together on a hide-away bed in the living room.

As usual, the children woke around 6:30 a.m. Charlie moved from the living room to the bed they had occupied. Kristi got up, dressed the children and got breakfast for them. She had told Charlie about the plan to go to Redding and left the note to remind him. She and the children left the home about 7:40 a.m. She left the house unlocked, as she usually did when Charlie was home.

Kristi drove to her parents' home in Burney. Her parents were out of town, but she talked to her grandfather, who was visiting there. He told her that he was planning to go to Redding, too. She then drove to the Mt. Shasta Mall, about an hour's distance.

She and the children window-shopped at the mall. At about 11 a.m., when she went to move her car, she discovered it had a flat tire. Neither she nor her grandfather could change it. She decided to call Charlie and ask for him to come with his truck. She called two times but got no answer. It was her habit to turn off the ringer while Charlie slept. She then called Belinda and asked her to go to the house to wake him.

Forensic tests established that the fatal bullet could have been discharged by twenty-seven different weapons. Fourteen such weapons were found in the course of the investigation, and two could not be ruled out as the murder weapon. They carried no identifying marks. Charlie himself had a rifle given to him by his wife's grandmother, and the model was the most common of the twenty-seven possible murder weapons. The gun had last been seen just over a week earlier in Charlie's truck. This gun was not found.

Charlie and Kristi had lived in the small house (a bedroom, a living room, a kitchen, a hall and a bathroom) for two weeks. It was located at 20292 Fir Street, Burney. It belonged to Kristi's grandmother, Margaret Beaman, who let Kristi and Charlie have it rent-free, so they could save money for a house of their own.

According to Margaret Beaman, her house had been previously occupied by Cindy Ellis and Ellis's ex-husband Frank Delgado, a known drug dealer. After Ellis and Delgado moved in, Beaman noticed an increase in traffic to and from the house at all hours of the day and night in a relatively rural area—traffic consistent with drug sales—and she evicted them because of that activity.

The Sheriff's investigators interviewed an acquaintance of Delgado, Oney Rhoades, who had stayed with Delgado at the Fir Street house in late February 1992. Rhoades reported that he had seen Delgado and Henry Garza in that house in possession of "dope" worth $40,000.

A confidential informant told Sheriff's detective Willie Cox on April 20, 1992, three days after the murder, that he felt the killing had been a mistake. The intended victim had been Delgado because he had "ripped off several people in town over drug dealings."

A neighbor on Fir Street, John Voet, had been up in the early morning of April 17, taking his mother to the hospital. When he returned to Fir Street around 3 a.m., he had observed a '78 or '79 Ford Fiesta with a distinctive orange stripe enter the cul-de-sac. Voet watched the car turn around at the end of the street, park in front of the Bateson house, switch off its lights and engine, and after twenty to thirty seconds depart at a high rate of speed. This deliberate maneuver reminded Voet that he had seen the same car a week earlier enter the cul-de-sac and drive in and out around midnight. Voet also saw the car a second time on the day of the murder, parked in the parking lot of a pizza parlor, Half Time Pizza. A confidential informant linked the car to both Garza and Delgado.

On May 6, 1992, Rory Keim informed Sheriff's deputy Compomizzo that on Sunday night following the murder, he and two friends were in Half Time Pizza discussing Charlie's death. Henry Garza approached their table and said: "That's a bummer. My partners blew away the wrong dude."

As of May 6, 1992, the police had four independent sources connecting the murder to drugs. A motive for the murder had been provided. A connection between the intended victim and Garza had been established. Garza had admitted knowledge of the murderers and of their mistake. No further information on the case was obtained until December 2001.

Two years later, Kristi married Troy Lunbery, a man she had dated occasionally before her marriage to Charlie. She and Troy have one child.

*The Investigation Reopened.* In December 2001, the investigation of the crime reopened. Detectives Steve Grashoff and Cliff Blankenship interviewed Troy on December 20, 2001. Later that day, at about noon, they dropped in on Kristi at her home. They told her they wanted to discuss Charlie's death. She could tell them to leave at any time. The interview was recorded.

For the first hour and one half, the detectives' approach was low-key, touching on various aspects of Kristi's life with Charlie and the events of April 17, 1992. Kristi was providing care to Jim, a man with severe mental retardation and epilepsy, and at various points in the interview his interruptions and inarticulate noises may be heard. Kristi's children were not home.

The interview became intense when the detectives showed her a FBI profile of the case and told her that a secret witness had inculpated her. Detective Grashoff then said, "Kristi, we think you did it." She denied it. The detectives said they knew she had done it and only wanted to know why. Was it because he was abusive? "For God's sake, tell the truth," Grashoff urged.

Eventually, Grashoff asked, "Did you shoot Charlie?" She answered, "Yes."

*Proceedings.* Kristi was indicted for "open murder," permitting conviction for murder in the first degree. She was not taken into custody. In preparation for the trial, Kristi's two lawyers accepted her statement that she had confessed falsely to the crime. They set about to see whether there was evidence of persons confessing to crimes they had not committed. They came in contact with Richard Ofshe.

Ofshe holds a doctorate in psychology from Stanford University and is a professor of social psychology at the University of California at Berkeley. He has been an expert witness both for prosecutors and for defendants on the psychology of interrogations and the psychology of false confessions. At counsel's request, Ofshe interviewed Kristi. He reported that she had described to him "a well-recognized type of confession — a stress compliant false confession."

Ofshe suggested to counsel that they have Kristi further examined by a clinical psychologist familiar with the Gudjohnsson Suggestibility Test. The author of this test was Gisli H. Gudjonsson, a faculty member of the Institute of Psychiatry, King's College, London, who had written *The Psychology of Interrogation and Confessions* (2003). In that treatise, Gudjonsson had reported on the basis of research that some confessions of crime were false. The false confessions were made either to shield another suspect or to end the stress of interrogation. There was no information on the number of false confessions. That they occurred was an established fact.

Counsel located one psychologist in the Redding area who had never heard of the Gudjonsson test, and another local psychologist who had heard of it but had never used it. Counsel did not investigate further. They entered into their trial file a memorandum stating their belief that Ofshe's testimony would be inadmissible and, if admitted, would have a negative impact on the jury because of its lack of substance.

Trial counsel sought pretrial rulings to permit the introduction of the evidence that the murder had been committed by Garza's partners. The trial court ruled against them.

At trial, the state suggested motives for murder — Charlie's $15,000 life insurance; the existence of an old boyfriend; Charlie's "controlling" conduct. However, one-third of the insurance had gone for Charlie's funeral; Kristi, as the mother of two little children, was dependent on Charlie's income.

The ex-boyfriend was the man Kristi married two years later; he was not on the scene in 1992. That Charlie was abusive to Kristi was suggested to her by the detectives throughout the 2001 interview, and Kristi appeared to adopt that reasoning as her own when she confessed to the crime. There was no evidence of physical abuse. The popular psychological term "controlling" was picked up by the detectives as an alternate description of Charlie's conduct. When Kristi gave the detectives an example of Charlie being controlling, the story she told was not about Charlie at all but about his father.

Kristi denied her guilt and repudiated her confession. Witnesses testified to her gentle disposition. The prosecution attempted to show that the murder had been planned, but produced no evidence of premeditation. It became the prosecution's burden to persuade the jury beyond a reasonable doubt that Kristi, at some time between 6:30 a.m. and 7:40 a.m., during which she had dressed and fed their children, had shot her husband and then had disposed of the murder weapon and any incriminating spots of blood. The sole significant evidence against her was her confession. The jury found her guilty of second degree murder.

*Appeal*. The centerpiece of the appeal was the evidence of third party culpability that the trial court had excluded. The California Court of Appeal for the Third Appellate District issued an unpublished opinion. As the Supreme Court of California summarily denied review, this unpublished opinion is the final judgment that in this habeas proceeding we review.

The court of appeal declared that "the only real evidence" that someone else had killed the victim was Rory Keim's report of Henry Garza's admission. That report was hearsay but admissible if three conditions were met. The first condition was that the declarant be unavailable. The condition was met. Garza was dead. The second was that the statement was against Garza's "penal interest." This condition, the court ruled, was not met. The third was that the declarant have "suf-

ficient knowledge of the subject." This condition, too, the court of appeal said, had not been met. The court found that the statement "may have been nothing more than boasting or the mindless remark of someone under the influence of liquor," and deemed the statement inadmissible.

Once Garza's statement was ruled out, the court of appeal in a single paragraph disposed of the other evidence of Garza's connection to the murder, ruling that "it lacked sufficient probative value to raise a reasonable doubt of defendant's guilt." Kristi's appeal was denied.

On December 7, 2006, Kristi filed a petition for habeas corpus with the Supreme Court of California. This petition included a claim of ineffective assistance of counsel. The petition was summarily denied.

On June 11, 2007, Kristi filed the present petition pursuant to 28 U.S.C. § 2254 in the district court. Habeas counsel interviewed Kristi's two defense lawyers as to why they had not offered Ofshe's testimony or investigated the false confession further. Each reported that the other had made the decision.

A magistrate judge recommended denial of the petition, and the district court denied it. This appeal followed.

## STANDARD OF REVIEW

We review de novo the district court's denial of a petition for a writ of habeas corpus. *Musladin v. Lamarque*, 555 F.3d 830, 835 (9th Cir. 2009).

Lunbery filed her federal habeas petition after 1996, and thus the petition is subject to review under the Antiterrorism and Effective Death Penalty Act (AEDPA). Under AEDPA, a writ of habeas corpus may be granted only if the state court's decision (1) was "contrary to or involved an unreasonable application of, clearly established Federal law, as deter-

mined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Davis v. Woodford*, 384 F.3d 628, 637 (9th Cir. 2004), *cert. dismissed*, 545 U.S. 1165 (2005). A decision involves an "unreasonable application" of federal law "if it correctly identifies the governing rule but unreasonably applies it to a new set of facts, or fails to extend a clearly established legal principle to a new context in a way that is unreasonable." *Himes v. Thompson*, 336 F.3d 848, 852 (9th Cir. 2003) (internal citations omitted).

## ANALYSIS

### I. *Ineffective assistance of counsel.*

Petitioner presses her claim that counsel was ineffective because they failed to call Professor Ofshe and failed to investigate further the validity of Kristi's confession. These failures, if established, constitute errors requiring the grant of the petition. *See Richter v. Hickman*, 578 F.3d 944, 952-53 (9th Cir. 2009) (en banc) (finding ineffective assistance of counsel where counsel failed to investigate and present at trial critical expert testimony), *cert. granted sub nom. Harrington v. Richter*, 130 S.Ct. 1506 (2010).

Failure has yet to be established. As evidence so far, we have only a memorandum in trial counsel's file stating why counsel decided not to call Ofshe and an affidavit of federal habeas counsel stating that she had interviewed Kristi's two defense counsel on the subject and that each had put responsibility on the other for not putting on expert evidence. To decide petitioner's claim we need the live testimony of her trial attorneys. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations,

which, if true, would entitle an applicant to federal habeas relief.").

We do not, however, need to delay our decision on her other contention.

II.   *The right of defense.*

**[1]** The Sixth Amendment to the Constitution guarantees the right of a criminal defendant to have a public trial, to confront the witnesses against him and to obtain witnesses in his favor. These guarantees are incorporated by the due process clause of the Fourteenth Amendment, binding the states. Due process includes a right to " 'a meaningful opportunity to present a complete defense.' " *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) citing *California v. Trombetta*, 467 U.S. 479, 485 (1984). That constitutional right is violated by the exclusion of probative admissible evidence that another person may have committed the crime. *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1972).

In *Chambers*, the defendant sought to introduce the testimony of three individuals to whom a third party had confessed to committing the murder for which Chambers was on trial. *Id*. at 298. The Mississippi State Supreme Court upheld the exclusion of this evidence because it was hearsay and not subject to exception under state evidentiary rules which, at the time, recognized only declarations against *pecuniary* interest. The United States Supreme Court noted that the hearsay statements involved in the case were made under circumstances that provided assurance of their reliability: the confessions were made spontaneously shortly after the murder, corroborated by some other evidence in the case, and were self-incriminatory. *Id.* at 300-01.

The Supreme Court ultimately determined that "under the facts and circumstances" of that case, exclusion of the evidence violated Chambers' constitutional rights. *Id.* at 303.

Stating that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense," the Supreme Court noted that the rejected testimony "bore persuasive assurances of trustworthiness" and that the "testimony also was critical to Chambers' defense." *Id.* at 302. "In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.*

*Chambers* controls. The state court excluded as hearsay Rory Keim's testimony that Henry Garza, dead at the time of Kristi's trial, had admitted that his partners had murdered Charlie Bateson in error, and the California court of appeal affirmed that ruling.[1]

**[2]** As in *Chambers*, Garza's statement was against his penal interest. He admitted the murder had been committed by his "partners." He exposed himself to the risk of criminal prosecution. At a minimum, he was an accessory after the fact. Cal. Pen. Code §§ 32-33. At a maximum he was an accessory before the fact or a co-conspirator with the killers and subject to the same penalty as the actual murderer. *Bompensiero v. Superior Court*, 281 P.2d 250, 256 (Cal. 1955); Cal. Pen. Code §§ 971, 182(a). As in *Chambers*, Garza's statement was made shortly after the murder, albeit not to a close acquaintance. As in *Chambers*, the incriminating statement was corroborated by other evidence in the case: (1) an acquaintance of Delgado's indicated that Garza and the former tenant of Kristi's home, Frank Delgado, were involved in drug deals together and had been seen in the house with

---

[1]As a habeas court, we do not review the propriety of the state court's application of its own evidentiary rules; rather, we consider whether it was unreasonable for it to conclude, in light of *Chambers*, that the exclusion did not violate Kristi's due process right to present a defense and receive a fair trial. *See Rice v. McCann*, 339 F.3d 546, 549 (7th Cir. 2003); *see also Chia v. Cambra*, 360 F.3d 997, 1003 (9th Cir. 2004).

$40,000 worth of illegal drugs, (2) a confidential informant told police three days after the murder that Delgado had been the intended victim because he had ripped off several people in drug deals,[2] and (3) a neighbor saw a car linked to both Garza and Delgado on the street in front of Kristi's house a few hours before the murder. The excluded testimony thus bore substantial guarantees of trustworthiness and was critical to Kristi's defense. *Cf. Chambers*, 410 U.S. at 302; *Chia*, 360 F.3d at 1006-07 (applying *Chambers*).[3]

**[3]** As is usually the case with pieces of evidence, each item of information Kristi sought to introduce gave meaning and coherence to Garza's admission, put it in context, and explained it. The state court of appeal, however, addressed each item independently without connecting it to the chain of circumstances, thereby missing the probative force of the whole chain. By deeming Garza's statement to Keim inadmissible hearsay, the state court of appeal dismissed the remaining pieces of evidence as providing only motive and opportunity to commit the crime, because there was no direct or circumstantial evidence that a third party had done so. Had Garza's statement been admitted, however, this missing element would have been supplied, and the remaining pieces of the puzzle would have become more relevant.

**[4]** The denial of Kristi's right to present a defense was compounded and magnified by factual mistakes made by the

---

[2]This confidential informant came forward within three days of the murder. However, the detective or prosecutor lost all notes regarding the identity of this informant and Kristi was thus unable to place his testimony before the jury. The trial court also denied her request to introduce the informant's statement or advise the jury that the prosecution had failed to preserve identifying information of the informant.

[3]These facts also distinguish this case from our recent decision in *Christian v. Frank*, 595 F.3d 1076, 1084 (9th Cir. 2010), where there was a "dearth of other corroborating evidence linking [the third party] to the crime." Here, the murder evidence was completely consistent with Garza's out-of-court statement.

court of appeal in the course of disposing of the evidence offered. The testimony of John Voet that identified the car in the cul-de-sac on the morning of the murder, April 17, was misstated by the court, putting the car there a day earlier on April 16, erroneously leading the court to conclude this evidence was not even probative.[4]

**[5]** The rulings of the state courts were prejudicial to Kristi's defense. Exclusion of the evidence of Garza's admission and Delgado's drug-dealing stripped her of evidence that someone other than she had probably committed the murder of her husband. Nor, as the state argues, was this evidence merely cumulative of other evidence in the trial. That Kristi's first statement to the police mentioned the drug-dealing at Fir Street was no substitute for Oney Rhoades' statement that he saw Garza and Delgado with a large amount of drugs at Fir Street, nor was it a substitute for Garza's admission that his partners committed the murder. Statements made by Kristi, the defendant, could not have been given near the level of weight as this independent evidence.

**[6]** Because Kristi was prevented from presenting this evidence, she was prevented from offering any alternate theory as to who might have committed the crime. The jury would not have been confused by such evidence. It would probably have been led to a state of reasonable doubt. The murder called out for a murderer. The trial as conducted by the superior court and as approved by the court of appeal left only Charlie's wife in view as the murderer.

**[7]** An accused does not have an "unfettered right" to present any evidence he or she wishes. *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). However, as *Chambers* teaches, depending on the facts and circumstances of the case, at times a state's rules of evidence cannot be mechanistically applied and must

---

[4]Moreover, the identification of the car as being associated with Garza was not mentioned by the court.

yield in favor of due process and the right to a fair trial. 410 U.S. at 302. As in *Chambers,* the excluded testimony here "bore persuasive assurances of trustworthiness" and "was critical to [Kristi's] defense." *Id.* California's application of its evidentiary rules denied Kristi her constitutional right to present a defense.

**[8]** That Kristi confessed to the crime does not detract from the prejudice flowing from her inability to present the defense of third party culpability, especially since she vigorously contested the truthfulness of that confession. The Supreme Court recently reaffirmed the rule of *Chambers* and other cases involving improper denials of the right to present a defense, when it overturned a South Carolina conviction in which a defendant was denied the opportunity to present evidence of third party culpability because of the strength of forensic evidence in that case. *See Holmes v. South Carolina*, 547 U.S. 319, 326-31 (2006). The error in this case had a "substantial and injurious effect" on the verdict, and therefore is not harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). The California court of appeal's conclusion to the contrary constitutes an objectively unreasonable application of *Chambers*. *See Chia*, 360 F.3d at 1006-07.

**[9]** For the reasons stated, the judgment of the district court is REVERSED and the case is REMANDED to it with direction to issue the writ.

---

HAWKINS, Circuit Judge, concurring:

I concur in the majority Opinion and write separately only because I believe Kristi Lunbery presented sufficient evidence that her trial defense counsel's decision not to further investigate or present expert testimony regarding false confessions fell below an objective standard of reasonableness.

The only evidence linking Kristi to the murder was her own statement, which she claimed was false. There was no forensic evidence connecting her to the crime, the murder weapon was never found and, even in her confession, Kristi displayed no knowledge of crime details not publicly known (such as the location of the murder weapon or how she managed to shoot her husband in a small, one bedroom house with two small children present). But she had confessed and it is hard to imagine anything more difficult to explain to a lay jury. After all, people do not just confess to crimes they did not commit, do they? Well, it turns out they sometimes do. Among the hundreds of persons exonerated of serious crimes through DNA testing are numerous individuals who earlier confessed.[1]

Kristi's defense lawyers recognized this problem and reached out to an expert in the field of false confessions, Dr. Richard Ofshe. Dr. Ofshe reviewed various materials relating to the murder and a videotape of Kristi's confession, and concluded it was likely a "stress compliant false confession." For Dr. Ofshe, the failure of a confession to fit the facts of a crime and the inability of a confessor to supply information that should be known to the perpetrator were "hallmarks of a false confession."

Dr. Ofshe recommended that Kristi be evaluated by a competent clinical psychologist who was familiar with the phenomenon of stress compliant confessions, and, in particular,

---

[1]Brandon L. Garrett, *The Substance of False Confessions*, 62 Stan. L. Rev. 1051 (April 2010) (examining forty false confessions to rapes and murders later exonerated by DNA evidence); *see also* Mark A. Godsey, *Shining the Bright Light on Police Interrogation in America*, 6 Ohio St. J. Crim. L. 711, 724 (Spring 2009) (noting that in addition to DNA exoneration, confessions have also been proven false when the identity of the true perpetrator is later discovered, or when it is later demonstrated it would have been physically impossible for the defendant to have committed the crime, such as when it is proven the defendant was in jail for another crime on the date the new crime occurred).

that Kristi take the "Gudjonsson test" for interrogative suggestibility. Kristi's attorney then contacted two local Redding psychologists; one had not heard of the test but agreed to "look into the situation"; the other had heard of it but had never administered it, and also suggested that he would need additional corroboration not mentioned by Dr. Ofshe to "support any conclusion that Kristi was vulnerable to manipulation techniques" (apparently not understanding he was only being asked to administer the test).

Kristi never took the Gudjonsson test prior to trial. In a somewhat confusing memo to the file, her attorney notes in one paragraph that he has made arrangements for Dr. Ofshe to testify on November 5th, then in the following paragraph concludes that the testimony would likely be inadmissible, and finally that it would be best simply to have Kristi testify because the jury ultimately needed to believe her. After Kristi was convicted, Dr. Ofshe wrote to her to express his sadness and related that he had anticipated he would be testifying at her trial, noting that he did not discover he was not going to be called until he contacted the attorney's office himself and discovered the trial was already underway. When Kristi's habeas counsel contacted Kristi's trial attorneys about the decision not to call Dr. Ofshe, they engaged in finger pointing, each claiming the decision was made by the other.

Because the California Supreme Court summarily denied this claim without a reasoned opinion, we must conduct a de novo review of the record to determine whether the denial was contrary to or an unreasonable application of federal law. *Greene v. Lambert*, 288 F.3d 1081, 1088-89 (9th Cir. 2002). The district court concluded that Kristi failed to establish that her counsel's representation fell below an objective standard of reasonableness, *see Strickland*, 466 U.S. at 688, and concluded instead that counsel made a reasonable, tactical decision not to call Dr. Ofshe. But a tactical decision infers a calculated reason to do or not do something. Here there was no reason not to call Dr. Ofshe and every reason to do so. The

record fairly smacks of incompetence, from the conflicting note to file, to the attorneys pointing fingers at one another, to the failure to even communicate the decision to the expert. It is also far from clear whether any decision, reasoned or not, was ever made here or by whom. Even though "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," the decision to prematurely limit an investigation may be, in and of itself, unreasonable. *Id.* at 690-91 ("[C]ounsel has a duty to make reasonable investigations.").

As the Supreme Court explained in *Wiggins v. Smith*, a premature choice to abandon a potentially fruitful avenue can make "a fully informed decision with respect to [ ] strategy impossible" and render counsel's performance deficient. 539 U.S. 510, 527-28 (2003). Here, counsel gave up after contacting two local psychologists by phone, and never tested Kristi to determine whether Dr. Ofshe's preliminary opinion could be bolstered or corroborated.

Counsel's proffered reasons for failing to offer Dr. Ofshe's testimony are also problematic. Counsel opined that Dr. Ofshe's testimony would likely be inadmissible if the government lodged a *Kelly-Frye* objection because the Gudjonsson test was not widely accepted.[2] Leaving aside that counsel failed to even attempt its admission, at the time of Kristi's trial, expert testimony based in part on the Gudjonsson test had been admitted in several other cases. *See Canady v. State*, 100 S.W. 3d 28, 31 (Tex. Ct. App. 2002)*; United States v. Doe*, 74 F. Supp. 2d 310, 318 (S.D.N.Y. 1999); *United States v. Raposo*, 1998 WL 879723, *3, 5-6 (S.D.N.Y. Dec. 16, 1998); *see also Vent v. State*, 67 P.3d 661, 670 (Alaska App.

---

[2]The trial memo does not elaborate on whether this conclusion is based on further research, or if it is based only on unfamiliarity of two local psychologists with the test.

2003) (noting "case law and law review commentary is split over whether to admit false confession expert testimony").[3]

Second, counsel opined that Ofshe's testimony could have a "negative impact" because it was "so lacking in substance." This is not an excuse but a self-fulfilling prophesy: if Dr. Ofshe's testimony lacked "substance" or corroboration, it was due to counsel's failure to obtain testing that would have provided it, despite being advised to do so. Surely that should be enough, but counsel also appears to have discounted Dr. Ofshe's specialized expertise in the area of false confessions in favor of the preliminary views of a local psychologist, Dr. Caruso. Summing up the decision not to even attempt to offer Dr. Ofshe as a witness, counsel wrote: "As Dr. Caruso put it: 'Kristi's best defense would be her explanation, the jury needs to believe Kristi.' "

This rather naively assumes that a jury would be easily persuaded—that an innocent person would confess to a crime they did not commit—by the confessor's testimony alone. Of course the jury had to believe Kristi, but the jurors would have been better equipped to evaluate her credibility and the confession itself had they known of the identified traits of stress-compliant confessions and been able to compare them to her testimony. Reversing a conviction where the trial court excluded the testimony of the very expert involved here, the Seventh Circuit noted that Dr. Ofshe's testimony went to the heart of the defense, and had it been admitted, it "would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried." *United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996); *see also Boyer v. State*, 825 So.2d 418, 420 (Fla. Ct. App. 2002) ("It is for the jury

---

[3]Indeed, after Kristi's trial, Dr. Ofshe's testimony was admitted in two other California cases, *People v. Gulley*, 2008 WL 4152951, *8 (Cal. Ct. App. 2008), and *People v. Cota*, 2007 WL 3360054, *12 (Cal. Ct. App. 2007).

to determine the weight to give to Dr. Ofshe's testimony, and to decide whether they believed his theory or 'the more commonplace explanation that the confession was true.' ") (quoting *Hall*, 93 F.3d at 1345).

For these reasons, in addition to the persuasive case for granting the writ made by Judge Noonan in the majority Opinion, I would also reverse the district court's decision that counsel's choice—not to further investigate or offer Dr. Ofshe as an expert witness— was a reasonable tactical decision and that the California court was not objectively unreasonable in denying the claim. Having said that, I agree that it is not presently necessary to delay the grant of the writ by remanding for an evidentiary hearing to determine *Strickland* prejudice.[4]

---

[4]Obviously, if this were the only issue before us, I would favor remand for such purposes.