Filed 8/25/15  P. v. Smith CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C072291 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F01517) |
| v. | |
| MARQUISE VINCENT SMITH, | |
| Defendant and Appellant. | |

Defendant Marquise Vincent Smith appeals following his conviction for second degree murder with firearm enhancements and possession of a firearm by a felon.  (Pen. Code, §§ 187, 12022.5, subd. (a)(1), 12022.53, subd. (d), 12021, subd. (a)(1); undesignated statutory references are to the Penal Code.)  The evidence showed defendant shot and killed victim Danielle Benefield as she sat in a car parked outside a gas station, apparently because defendant mistakenly believed that car had chased him earlier in the evening causing defendant to damage his mother's car.  On appeal,

1

defendant contends the trial court violated his constitutional right to present a defense when it excluded evidence of third party culpability. We affirm the judgment.

FACTS AND PROCEEDINGS

A Fastrip gas station was a popular late-night hangout. On September 4, 2010, after 2:00 a.m., Danielle Benefield arrived there in a car with two female friends. The driver got out to mingle with the crowd, but Benefield stayed in the car with Roxanne Neal, who did not like the atmosphere. When the driver did not return right away, Benefield got in the driver's seat and moved the car to the side. A man holding a gun at his side emerged from some parking stalls and called out, "Do we have a problem?" Before they could answer, the man began firing his gun. Neal ducked down in the back seat. She heard three gun shots and the sound of glass shattering. Benefield said, "I've been hit." The car was moving and drifted, but Neal managed to stop it. She did not get a good look at the shooter's face because she was focused on his gun, which appeared to be a revolver. He was wearing a white T-shirt and blue jeans.

The victim died within minutes from a single gunshot that entered through her back and passed through her right lung and heart.

Defendant's friend, Fredrick Robinson, called as a witness by the prosecution, testified he went with defendant to "hang out" at the gas station around 1:30 a.m. Defendant was wearing a white T-shirt. They greeted a mutual friend, Gary Castillo, who was driving a Ford F150 truck. At some point, defendant left in his car with a female friend. About 30 to 45 minutes later, Robinson heard three gun shots. Robinson got in Castillo's truck, and Castillo drove them to another gas station about a mile away, where they encountered defendant. At trial, Robinson denied seeing defendant return to the Fastrip before the gun shots.

The prosecution called as a witness Lonnell Hart, another of defendant's friends. Hart did not want to be a "snitch" and denied telling police he received a phone call the

2

next day from Robinson, who said defendant "done shot somebody." Hart's testimony was impeached with a recorded police interview, played for the jury, in which Hart told police that Robinson called and said "Quise," aka defendant, thought someone in a car was chasing him that night and, when he spotted what he believed to be that car, defendant fired shots into it. In his trial testimony, Hart denied or said he could not recall making the statements to police.

Gary Castillo testified defendant left the Fastrip for about 30 minutes but returned before the shots were fired and said someone in a car had chased him, causing defendant to hit a curb and damage his mother's car. At trial, Castillo testified defendant left again, before the shots were fired. In a recorded police interview played for the jury, Castillo said Robinson kept saying, "That stupid-ass nigger" as they left after the shooting. Castillo also told police that, before the shooting, defendant saw Castillo had a gun, agreed it was necessary and, when Castillo asked whether defendant had his "thing" with him, defendant said, "Oh, you know it." Castillo had previously seen defendant with a gun but did not see it that night.

Sheriff's Detective Elaine Stoops interviewed defendant on February 3, 2011, after his arrest on a probation violation. He said he parked at a Shell station across the street from the Fastrip, heard the gun shots, ran to see if Robinson was okay, and met up with Robinson and Castillo at a nearby Chevron station. Defendant was wearing a gray and white vest and blue jeans that night. Defendant had a second police interview a couple of days later, after which Stoops escorted defendant back to jail and heard him say, "I'm not a killer. It was an accident."

Defendant made two phone calls from jail to a Bonet Banks on February 10, 2011, the recordings of which were played for the jury. In the first call, before he was interviewed about this murder, defendant said, "I'm gonna knock my time, you know, I'm a grown man, I did what I did, you told me, but it wasn't on purpose so . . . it's all good." In the second call to Ms. Banks after police interviewed defendant about the

3

murder, he said he believed Hart and Robinson had "snitched on this shit." He said, "If you rockin' with me like that nigga, you supposed to rock tough nigga" and "That's what I get for fuckin' with bitch niggers and doin' stupid shit. [¶] . . . [¶] But it's all good though, you feel me? Cause, uh, do you feel me, it wasn't on purpose an accident [*sic*], you feel me, so there's a -- there's a cause and reaction for everything." He said when he got out, those "snitches" and everybody in that circle had "better, you feel me, stay clear . . . ."

The defense called as a witness the victim's cousin, Latrice Hatcher, who said she was in a separate car that night. She heard the gunshots and saw the shooter but could only identify him as a black man wearing a white T-shirt and jeans. She originally told police the shooter was bald and got into a burgundy Ford Taurus but admitted at trial this was what she heard other people say.

Defendant's mother, Lakeitha Smith, testified defendant borrowed her car that night, left wearing a black T-shirt, and the next morning expressed remorse that the rim on one of her tires was bent.

Defendant testified he was convicted of a felony in 2009 and therefore is prohibited from owning a gun. He denied having a gun or shooting it at Fastrip that night. He borrowed his mother's car and went to socialize with Robinson and friend Lanesha "London" Blake. At the Fastrip, London asked him to give her a ride to pick up something, and he did. On the way, London received a phone call from a man who yelled about her being with defendant. When they reached London's destination, defendant noticed a white car, got a "weird feeling," and so turned around and left. The car followed him and cut him off at a stop sign. Defendant backed up and drove around the white car to get back on the road, but the car continued to follow him. Defendant sped up, made a sharp turn, and hit the curb, bending a tire rim. He pulled into the Fastrip parking lot. He got out of the car to look for Robinson. About 20 seconds later,

4

he heard gunshots. He did not see the shooter or if anyone was hit. He left the scene and met up with his friends at a Chevron station.

As to his phone conversations with Banks, defendant testified he referred to Robinson and Hart as "snitches," meaning they had lied to the police about him being the shooter. He referred to "what I did," meaning only he never should have gone to the Fastrip. His comment "it was an accident anyway" was based on what other people were saying. Defendant claimed Detective Stoops misinterpreted his statement in jail; what he said was, "I am not a killer. [¶] . . . [¶] This had to be an accident." He lied to the detective about other matters, such as claiming he was at the Shell station, not Fastrip.

The jury found defendant not guilty of first-degree murder, but guilty of second-degree murder and found true that defendant personally and intentionally discharged a firearm resulting in death (§ 12022.53, subd. (d)) and personally used a .38 caliber revolver (§ 12022.5, subd. (a)(1)). The jury also found defendant guilty of possession of a firearm by a felon (§ 12021, subd. (a)(1)).

The trial court sentenced defendant to a total of 40 years to life in prison: an indeterminate term of 15-years-to-life for second degree murder, plus a consecutive term of 25-years-to-life for discharging a firearm resulting in death (§ 12022.53, subd. (d)). The court also sentenced defendant to 10 years for personal use of a firearm (§ 12022.5, subd. (a)(1)) and two years for count two possession of firearm by felon (§ 12021, subd. (a)(1)) -- both stayed under section 654.

DISCUSSION

I

*Third Party Culpability*

Defendant contends the trial court erred when it excluded evidence of third party culpability, thus violating his constitutional right to present a defense. Assuming he did

5

not forfeit a constitutional claim by failing to raise it in the trial court, as urged by the Attorney General, we reject defendant's contention.

Before trial, the defense filed a motion in limine seeking to admit hearsay evidence of third party culpability. Counsel said that, in reviewing police reports, he saw that the victim's cousin Latrice Hatcher called Detective Elaine Stoops in February 2011 and said she (Hatcher) had talked to her aunt, Deborah Flournoy, who said she was on the phone with someone named Red the night of the killing and heard Red say, "Oh 'fuck' I just killed that 'bitch'! I didn't mean to kill that 'bitch'." Flournoy said to Red, "Blood for blood, that was my niece." Flournoy asked Red what happened, and "I [Hatcher] guess he hung up on her." Flournoy told Hatcher Red is a silent killer and "he don't play." The defense asserted the police never followed up.

On July 10, 2012, the defense team interviewed Flournoy, who was in custody on an unrelated matter and would not agree to be recorded. She said that on the night of the shooting, a person named "Red" called her to "cop some dope." When they ended the conversation, she heard Red, who apparently thought he had hung up his phone, say to his "homies" in the background that he had "shot some bitch" and he "mentioned" a gas station. On July 25, 2012, the defense got her to sign a written statement saying this was true. Shown five photographs including defendant's, she said none of them was the Red on the phone.

Defense counsel asserted he was not aware of any other gas station shootings, and females rarely get shot. He wanted to have Flournoy testify before the jury as to what Red assertedly said, because "[w]e can't find Red," and the hearsay was admissible as an admission against Red's penal interest. Defense counsel said Flournoy said she would contact Red when she got out of jail, but that was two months away. She had his number in her cell phone, which she did not have in jail and would not allow the defense to access outside her presence. The number Flournoy gave as her own does not appear on defendant's phone records. Counsel asserted Flournoy said Red was a member of the

6

Oak Park Bloods gang, and his motive was that he was rejected by the girl he shot, whom he wanted to date.

Defense counsel said he could not force Flournoy to help and asked the trial court at least to summon Flournoy to court and compel her to reveal Red's identity.

The trial court agreed with the prosecution that the defense had not even passed the threshold of showing diligent efforts to find Red. The court offered an Evidence Code section 402 hearing for the defense investigator to testify on this point, but defense counsel asked to "table this until even after opening statement" to give the defense more time to try to find Red. The trial court agreed but warned defense counsel "it would be on you to raise it before the Court at the appropriate time." Defense counsel agreed.

Defendant did not revisit the matter.

On cross-examination of Detective Stoops, defense counsel, over the prosecution's objection, asked about Hatcher's phone call. The detective said, "She told me that her aunt had been on the phone with someone by the name of Red who she believed to be [defendant], who had talked about being the person who did the shooting, yes." After reviewing her notes, the detective said Hatcher did not say Red was defendant.

During a break in defendant's testimony, the court stated there had been a brief conversation in chambers, and "we need to address [a matter] that has been under submission since the beginning of the trial . . . whether to permit testimony from a witness who claims that she had a phone call from an individual named Red who made an assertion, unwitting assertion that he had shot and killed a female." Defense counsel said everything was in his moving papers, except the defense efforts to find Red. Counsel reiterated those efforts. He interviewed Flournoy twice and she would not reveal Red's identity or give a physical description. She would not give the defense permission to look through her phone outside of her presence. She alternately wanted to wait or, in counsel's perception, she seemed scared because she said, "Red doesn't play."

7

Defense counsel also said he had asked defendant's family to contact anybody they know who might know Red, but they were unsuccessful. The defense heard from the prosecution that Hatcher, who is the victim's cousin, believed Red was one Darryl Buckner. The defense found Buckner in jail, but he denied knowing Flournoy or being involved, and anyway he was in jail at the time of the shooting and could not have made a cell phone call to Flournoy. Counsel asserted from "general knowledge" that Red is a popular nickname. Counsel concluded Red was unavailable. Counsel acknowledged the court also had concerns about reliability of the statement attributed to Red, but said he had nothing to add to his written motion in limine. Defense counsel acknowledged defendant is sometimes referred to as Red but noted Flournoy did not identify a photo of defendant as the Red who phoned her.

The trial court asked if it was a fair statement that the defense "investigation has further revealed the prospect that there is another individual named Red somewhere out in the world unidentified, and that you have extreme difficulty obviously in finding such a person." Defense counsel replied, "I think not our investigation, but just general knowledge of being around the courthouse representing people named Red, seeing people named Red, aka, but not investigation, per se."

The prosecutor argued the statement attributed to Red said nothing about when or where the incident assertedly occurred; the person who claimed to have overheard the statement during a drug deal was uncooperative; the motive attributed to Red (the source of which was undisclosed) did not match the facts of this crime; the person who was supposed to be Red was not the right Red; and the search for this mysterious person could go on forever; and there was not enough information to show credibility or third party culpability.

The trial court found there was some indicia of a declaration against interest, but the identity of the declarant was unknown; "the context of the statement attributable to him suggests unreliability"; and a person who was thought to be the declarant turned out

8

not to be the declarant. "The Court believes the utterance is unreliable, obviously not subject to cross-examination. And without indicia of reliability, admission of the statement would be fundamentally unfair to the People, as there would be no opportunity to test or confront the truth of the utterance or the circumstances specifically surrounding the utterance as, or when made, I should say, by the declarant. [¶] So, accordingly, the Court will preclude Ms. Flournoy from testifying that she . . . heard this utterance from this individual. And, again, the Court does not make this ruling lightly as it has considered the potential probative value of the utterance against the reliability or unreliability more specifically of the utterance. [¶] The utterance carries very, very little weight. [¶] It is difficult to allow someone to just simply come into court and say: 'I got a call from an individual that you can't find,' who no one knows who it is, who claims they committed the act. [¶] That has virtually no probativ[]e value."

To be admissible, third party culpability evidence need only be capable of raising a reasonable doubt of the defendant's guilt. (*People v. Hall* (1986) 41 Cal.3d 826, 834.) Any such evidence remains subject to exclusion under Evidence Code section 352 if its probative value is substantially outweighed by consumption of time or danger of undue prejudice or confusing or misleading the jury. (*Hall, supra*, at pp. 834-835.) A trial court's ruling on admissibility of third party culpability evidence is reviewed for an abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 581.)

Evidence Code section 1230 provides that an out-of-court declaration against penal interest is admissible if its proponent shows the declarant is unavailable; the declaration was against the declarant's penal interest when made; and the declaration is sufficiently reliable to warrant admission despite its hearsay character. (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611 (*Duarte*).) A person is unavailable as a witness if he is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) The focus of the declaration against interest

9

exception is the basic trustworthiness of the declaration. (*People v. Geier* (2007) 41 Cal.4th 555, 584 (*Geier*).)

Defendant suggests any declaration against penal interest is necessarily trustworthy and reliable, requiring the trial court to allow it. Not so. In determining whether a statement is sufficiently trustworthy to be admissible under Evidence Code section 1230, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant. (*Duarte, supra*, 24 Cal.4th at p. 614; *People v. Frierson* (1991) 53 Cal.3d 730, 745 (*Frierson*).) The determination as to whether trustworthiness is present "requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception." (*Frierson, supra*, at p. 745.) This endeavor is committed to the sound discretion of the trial court, and its finding regarding trustworthiness will not be disturbed on appeal absent an abuse of discretion. (*Geier, supra*, 41 Cal.4th at p. 585; *Frierson, supra*, at p. 745.)

Here, the trial court expressly found the context of the statement attributable to Red suggested unreliability. The evidence supports this finding. The context was that the victim's aunt, who could be expected to want her niece's killer brought to justice, refused to identify Red. Flournoy said Red "mentioned" a gas station but did not say Red said the shooting happened at a gas station. Contrary to defendant's suggestion on appeal, there was no evidence that this was the only gas station shooting at or about this time. Rather, defense counsel said he was unaware of any other gas station shootings. There was no evidence, except that defendant was also known as Red, corroborating "Red" as the killer. Other than defendant's denials, all evidence pointed to defendant. Contrary to defendant's argument, the trial court did not conclude the evidence was unreliable only because Red's identity was unknown.

The trial court did not improperly evaluate credibility but instead noted the prosecutor had no way to test the credibility of the hearsay statement attributed to Red -- "there would be no opportunity to test or confront the truth of the utterance or the circumstances specifically surrounding the utterance as, or when made, I should say, by the declarant." Defendant submits it is unfair to exclude Red's statement because the prosecutor cannot cross-examine, while at the same time denying defendant the tools to determine Red's identity. However, the trial court did not exclude the evidence merely because of lack of opportunity for cross-examination, but because the evidence was not sufficiently reliable.

We conclude the trial court did not abuse its discretion by excluding the statement attributed to Red for lack of trustworthiness. Our conclusion on this point also disposes of defendant's claims that exclusion violated his constitutional rights to present a defense and to due process. The trial court's correct application of the ordinary rules of evidence generally does not impermissibly infringe on a defendant's right to present a defense. (*People v. Boyette* (2002) 29 Cal.4th 381, 427-428.) *People v. Ayala* (2000) 23 Cal.4th 225 (*Ayala*) held the trial court did not violate the defendant's constitutional rights by excluding hearsay statements of two persons, since deceased, bolstering the defendant's claim of third party culpability, where there was no opportunity for cross-examination and the statements were not made under circumstances suggesting they were reliable. (*Id*. at p. 270.)

In *People v. Garcia* (2005) 134 Cal.App.4th 521, a defendant charged with robbery-murder in Laguna Beach sought to have the lead detective testify that a deceased former police officer said she spoke to a stranger in a bar, Manuel Rodriguez, who said he committed a robbery and homicide in Laguna Beach. (*Id*. at pp. 523, 534.) Other evidence implicated Rodriguez as the perpetrator. (*Id*. at p. 527.) The defendant claimed the trial court's exclusion of the evidence violated his right to due process. (*Id*. at p. 535.) The defendant relied on *Chambers v. Mississippi* (1973) 410 US. 284 [35

11

L.Ed.2d 297] (*Chambers*) and *Green v. Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738] (*Green*).) (*Garcia, supra*, 134 Cal.App.4th at pp. 537-539.) *Chambers, supra*, 410 U.S. at pp. 299-300, held state law that did not recognize a hearsay exception for declarations against penal interest violated due process by excluding confessions by a declarant to a close acquaintance, each confession corroborated by some other evidence in the case. (*Garcia, supra*, at pp. 535-538.) Similarly, in *Green, supra*, 442 U.S. at pages 96-97, the state law was similarly restrictive and led to exclusion at the penalty phase of a capital case a statement by a codefendant that he shot the victim while the defendant was absent from the scene, and the prosecution considered it sufficiently reliable to offer it against the codefendant at his trial pursuant to a different evidentiary rule. (*Garcia, supra*, at p. 538.)

*Garcia* rejected the defendant's apparent argument that a statement by a retired police officer to an investigating officer is inherently reliable and held the trial court did not err in excluding the evidence as insufficiently reliable. (*Id*. 134 Cal.App.4th at p. 539.) Rodriguez purportedly made an incriminating statement to a total stranger in a bar. According to the prosecutor, the former officer had contacted "America's Most Wanted" and said someone named Hernandez claimed he murdered someone somewhere. The prosecutor said the detective had interviewed the former officer and showed her a photo lineup that included Rodriguez's photo but she was unable to make a positive identification. Defense counsel did not dispute this recitation but said it left out something, which was unidentified. *Garcia* concluded that, based on the facts before the trial court, the retired officer's statement to the detective lacked reliability. (*Id*. at p. 539.)

*Garcia* also concluded the trial court did not abuse its discretion by not holding an evidentiary hearing, because the defense offered no reason for the court to do so. (*Id*. 134 Cal.App.4th at pp. 539-540.)

Defendant argues *Garcia* is distinguishable because the declarant who purportedly incriminated himself was unquestionably unavailable for cross-examination because he was dead. We cannot credit that argument. The declarant of the incriminating statement -- Rodriguez -- was not dead and in fact testified at Garcia's trial. (*Id*. 134 Cal.App.4th at p. 532.) It was the retired police officer who was deceased.

Defendant notes *Garcia* added as an additional reason for its decision that the excluded statement would have been cumulative because two witnesses testified Rodriguez admitted the crime. (*Id*. 134 Cal.App.4th at p. 539.) Here, the evidence would not have been cumulative. However, *Garcia* recited it as an additional reason, not the sole or dispositive reason.

Defendant contends the trial court, by failing to summon Flournoy to command her to disclose Red's identity, denied him his constitutional right to compulsory process under the Sixth Amendment of the federal Constitution, which applies to the states (*Washington v. Texas* (1967) 388 U.S. 14, 18-19 [18 L.Ed.2d 1019]), and California Constitution, article I, section 15. (*People v. Francis* (1988) 200 Cal.App.3d 579, 585 [to coerce witness to testify, court may incarcerate her or prosecute her for criminal contempt].) Defendant posits that he could have then called Red as a witness and used Flournoy's testimony for impeachment if necessary or, alternatively, Flournoy's refusal to identify him would render him unavailable such that Flournoy's testimony would be admissible. Defendant argues that, unlike *Garcia* where the defense gave no good reason for a hearing, here defense counsel gave a good reason for a hearing -- to make Flournoy divulge Red's identity. Defendant claims the trial court refused to bring Flournoy into court based on an erroneous notion that defendant must first show Red was unavailable.

However, when offered by the court, defense counsel declined to have his investigator testify to prove diligent efforts to find Red without having the court summon Flournoy, which the court indicated was a threshold inquiry. Defense counsel instead asked to "table" the matter. He thus abandoned his initial request and did not renew the

13

request until the trial court noted the defense had not pursued the matter. He then acknowledged he was not relying on the defense investigation "per se" to show unavailability.

In any event, even assuming Red were deemed unavailable, that would not allow Flournoy to testify about Red's alleged statement. Even death, which clearly makes a declarant unavailable, does not make the declarant's hearsay statements admissible. (*Ayala, supra*, 23 Cal.4th at pp. 267-269; *Garcia, supra*, 134 Cal.App.4th at p. 539.) We agree with the Attorney General that, based on the information before the trial court at the time of its ruling, the court could reasonably conclude the statement attributed to Red was unreliable, regardless of his unavailability.

Moreover, there was insufficient indicia of reliability to have Flournoy testify. Defendant speculates Flournoy may have added new facts to enhance reliability, e.g., she may have added new information that Red admitted the person he shot was her niece. However, speculation does not suffice.

In his reply brief, defendant relies heavily on *Lunbery v. Hornbeak* (9th Cir. 2010) 605 F.3d 754. There, a defendant sought habeas corpus relief on the ground the California courts violated her Sixth Amendment right to present a defense in her trial for murder of her husband, by excluding evidence by a witness who heard one Henry Gaza, dead at the time of trial, state that he and his partners had killed the husband in error, mistaking him for the person who had cheated them in a drug deal. (*Id*. at p. 757.) The Ninth Circuit held the exclusion of Garza's statement deprived the defendant of the right to present a defense because the excluded testimony bore substantial guarantees of trustworthiness and was critical to the defense. (*Id*. at p. 761.) The statement was trustworthy -- not just because it was a declaration against penal interest, as defendant suggests -- but because "the incriminating statement was corroborated by other evidence in the case:" (1) an acquaintance of Frank Delgado, the former tenant of the defendant's home, indicated Garza and Delgado were involved in drug deals together and had been

14

seen in the house with $40,000 worth of illegal drugs; (2) a confidential informant told police three days after the murder that Delgado had been the intended victim because he had ripped off several people in drug deals; and (3) a neighbor saw a car linked to Garza and Delgado on the street in front of the defendant's house a few hours before the murder. (*Ibid.*)

*Lunbery* does not help defendant in this case, where there was no comparable evidence of a corroborative nature to support Red's allegedly incriminating statement.

We conclude the trial court did not err, thus, we need not address defendant's argument that the claimed error was prejudicial.

DISPOSITION

The judgment is affirmed.

                                              HULL              , J.

We concur:

     NICHOLSON     , Acting P. J.

     BUTZ            , J.