Filed 2/6/14  P. v. Garcia CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRAULIO S. GARCIA,<br><br>    Defendant and Appellant. | 2d Crim. No. B241780<br>(Super. Ct. No. LA065394)<br>(Los Angeles County) |

Braulio S. Garcia appeals from the judgment following his conviction by jury of attempted willful, deliberate and premeditated murder (Pen. Code, §§ 664, 187, subd. (a));[1] possession of a firearm by a felon (former § 12021, subd. (a)(1)); and attempted criminal threats (§§ 664, 422).  The jury found true allegations that appellant personally used a firearm in the attempted murder (§ 12022.53, subds. (b) & (d)), and that he intended to benefit a criminal street gang when he attempted to murder and threaten the victim (§ 186.22, subd. (b)(1)(C)).  The trial court sentenced him to state prison for 31 years to life.  Appellant contends the trial court violated his Sixth Amendment right to confrontation in finding the victim was unavailable for trial and admitting his preliminary hearing testimony, and deprived him of his right to present a defense by excluding the victim's statement expressing fear of third parties.  He also challenges the sufficiency of

---

[1] All statutory references are to the Penal Code unless otherwise stated.

the evidence to support his attempted criminal threat conviction and the finding that he intended to benefit a gang when he attempted to threaten and kill the victim.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Attempted Criminal Threat - June 2010*

In early June 2010, Francisco Bautista left his Variel Street residence in Canoga Park to walk to work.  Juan Tellez nearly hit Bautista with his truck.  He recognized Juan, who lived with his brother Jose, across the street from Bautista.  Juan and Jose were known as the "Michoacán brothers."  Appellant, whom Bautista knew as Necio, was with Juan.  Bautista argued with Juan and pushed him.  During the fight, appellant told Bautista, "Be very careful.  When I was out of jail I killed two people.  I killed two people in El Cielito.  You don't know who I am[.]  I know who you are. . . . I'm Canoga."  Minutes later, Bautista continued walking to work.

*June 21, 2010, Attempted Murder*

On June 21, 2010, just before 8:00 p.m., Bautista and several other men were gathered in the back yard of Carlos Padillos' equestrian property at 7449 Eton Avenue in Canoga Park.  Bautista was sitting at a table, drinking beer and talking with other men.  About 10 minutes after Bautista's arrival, appellant arrived with two men known as "Sicko" and "Flaco."  They approached Bautista.  Sicko greeted Bautista briefly, then stepped aside.  Appellant, who had been behind Sicko,  said, "Here you go[,] [h]ere you go[, [c]]abron," and shot Bautista from a distance of about 15 feet.  Sicko is the moniker of Canoga member Alejandro Flores.

Everyone except Padillos fled from his back yard immediately after the shooting.  Los Angeles Police Department Officers Eloy Navarro and Cesar Flores responded to an "ambulance shooting" call at 8449 Eton Avenue.  They found Bautista lying in a pool of blood in the front yard of a residence.  When asked who shot him, Bautista responded, "The Michoacán brothers did it."  He gave Navarro their address at 8325 Variel Avenue, apartment 19.  Bautista said, "I think I'm going to die."  An ambulance took him to a hospital, where he remained for 22 days.  As a result of the shooting, Bautista must wear a colostomy bag.

2

Several officers immediately went to the Tellez apartment. One of the Tellez brothers answered the door. They both complied when officers directed them to step outside. Officers handcuffed and detained both Juan and Jose before searching the apartment. Officer Peter Victorino found a .45-caliber semiautomatic handgun and an empty magazine hidden inside the apartment's wall heater. The gun was not loaded. Victorino also found a .38-caliber revolver in the family room. It was concealed under a bag, inside a trash container. The officers found appellant hiding under a bed.

While investigating the crime scene on the night of the shooting, Detective Foster Rains recovered seven expended .45-caliber cartridge casings and one expended projectile from Padillos' back yard. Subsequent testing established that all seven cartridge casings were fired by the .45-caliber handgun.

Jose Diaz testified that he was sitting with Bautista at the table in Padillos' back yard on June 21, 2010. He saw two men approach Bautista and say something like, "What's up?" The men moved away quickly and appellant shot Bautista. Appellant and his companions left. Bautista fell and Diaz hid behind a fence. When Diaz came back out, everyone was gone.

On June 21, 2010, Officer Juan Estrada took Padillos from his residence to the Tellez apartment on Variel. Padillos was crouching in the back seat of the police car, and sought reassurance that the suspect (appellant) could not see him. Padillos saw appellant and said, "Yes. That's him. I saw him running away from my backyard . . . after I heard the gun go off." Later that night, while he was alone with Officer Navarro in his back yard, Padillos said, "You have the right guy. You have the right guy. You have him. You have the right guy." At the time, Padillos seemed fearful, his voice quivered, and he was whispering although the back yard was empty. At trial, Padillos testified he heard gun shots but did not see the shooting because it occurred while he was busy caring for his horses. Padillos also denied that he saw the Michoacán brothers that night. He further testified he did not recall that he spoke with police officers that night or accompanied them to identify a suspect.

3

## DISCUSSION

### *Evidentiary Claims*

### I

### *Admission of Victim's Preliminary Hearing Testimony*

Appellant argues that the trial court erred and violated his constitutional right to confrontation by admitting Bautista's preliminary hearing testimony because the prosecution did not exercise due diligence to secure his presence at trial. Appellant makes a related argument that his counsel's concession of due diligence at trial deprived him of the effective assistance of counsel. Respondent argues that appellant waived this claim by conceding the due diligence issue. Waiver aside, we reject appellant's arguments as meritless.

Bautista testified at appellant's preliminary hearing, and was cross-examined by counsel. Bautista failed to appear at trial, despite his repeated assurances that he would do so. The prosecution moved to introduce Bautista's preliminary hearing testimony at trial, based upon his unavailability. During the hearing on its motion, the prosecution presented the following evidence of its efforts to secure Bautista's attendance at trial:

In September 2010, Bautista went to Mexico to seek medical treatment for his gunshot wounds. He provided the prosecution with telephone numbers and addresses of his mother and his brother. In late October, Detective Ray Diaz received inquiries from Bautista about the status of this case. Diaz sensed that Bautista might be somewhat hesitant to testify, and fearful of retaliation.

On March 17, 2011, and May 4, 2011, Diaz sent email messages to Bautista. He did not reply. Diaz sought assistance from Department of Homeland Security Special Agent David Baltazar to contact Bautista in Mexico. Baltazar tried to contact Bautista by telephone. He eventually reached his brother, Rigoberto, who provided Baltazar with a different telephone number for their mother. Baltazar tried but failed to reach anyone at that number. Baltazar next called Rigoberto and asked him to convey a message to Bautista. He agreed to do so.

4

On July 7, 2011, Bautista telephoned Baltazar. Bautista said he "was doing well health wise, but . . . needed financial assistance." On July 20, 2011, Baltazar told Bautista he needed to come to the United States to testify at trial. Bautista said he was willing to do so. Baltazar tried to contact Bautista in October 2011, to check on his status. He also called Rigoberto and learned Bautista no longer had a cell phone. On January 9, 2012, Baltazar called their mother's number and spoke with Rigoberto, who said Bautista was working in the field. Baltazar left a message asking that Bautista call him.

Baltazar called Bautista's number on January 17, 2012, and heard a recording with English and Spanish statements explaining he was no longer available or was out of the area. On January 19, 2012, Baltazar contacted Rigoberto and obtained Bautista's new telephone number. He reached Bautista, who again indicated he needed money. Bautista gave Baltazar another contact number. On January 20, 2012, Baltazar told Bautista the prosecution would take care of his travel expenses. Bautista said he wanted to stay in Mexico to care for his daughter. Bautista also told Baltazar he was afraid. Bautista "said the main reason for Michoacan is in Canoga Park [*sic*], and he was afraid to come over." Baltazar tried to call Bautista on January 30, 2012. His outgoing message stated his phone was outside the coverage area or no longer in service. Baltazar's subsequent attempts to contact Bautista were fruitless.

In February 2012, Homeland Security Special Agent Eddy Wang obtained a second "significant public benefit parole visa" for Bautista to enter the United States to testify at trial. (Wang had obtained another visa for Bautista in December.)

In response to the trial court's inquiry about the adequacy of the prosecution's efforts to secure Bautista's attendance at trial, appellant's counsel stated: "I can't see what more the D.A. could have done if . . . the victim, does not want to come. [A]s far as their exhausting all their remedies, I'm fairly familiar with immigration law. And I know it's pretty difficult to get somebody to come here for 90 days and have to leave. . . . So there are issues here with the colostomy bag and everything. He didn't want to be here, and they can't force him. He did not want to be here. I can't find any

5

objection to the due diligence argument. I think they've done everything they could outside of locking him up." The court found that the prosecution had exercised due diligence in trying to secure Bautista's attendance at trial. It further found that Bautista was afraid to attend trial. The court ruled that the prosecution could read Bautista's preliminary hearing testimony at trial. Appellant's counsel stated, "We're okay with the preliminary hearing transcript . . . as redacted."

We independently decide the issue of due diligence. (*People v. Cromer* (2001) 24 Cal.4th 889, 901 [appellate courts should independently review trial court's determination that prosecution's failed efforts to locate an absent witness are sufficient to justify an exception to the defendant's constitutionally guaranteed right of confrontation].)

The constitutional right to confront witnesses is not absolute. (*People v. Herrera* (2010) 49 Cal.4th 613, 621.) An exception exists where a witness is unavailable but has given testimony at a previous judicial proceeding against the same defendant and was subject to cross-examination. (*Ibid*.) "Pursuant to this exception, the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating a defendant's confrontation right." (*Ibid*.) This traditional exception is codified in Evidence Code section 1291, subdivision (a)(2). (*Ibid*.)

A witness is unavailable within the meaning of Evidence Code section 1291 if he is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) Factors that the court should consider in determining whether the prosecutor has shown reasonable diligence include the timeliness of the search, the importance of the witness's testimony, and whether leads to the witness's possible location were reasonably explored. (*People v. Thomas* (2011) 51 Cal.4th 449, 500.) We independently review the prosecution's claim of good faith and reasonable diligence. (*People v. Herrera, supra*, 49 Cal.4th at p. 623.)

In arguing that the "prosecution did not establish due diligence in securing [Bautista's] attendance at trial," appellant relies in large part upon *People v. Sandoval*

(2001) 87 Cal.App.4th 1425, 1432.  He argues that the prosecution should have sought assistance from Mexico, pursuant to its treaty with the United States concerning cooperation in criminal cases, to bring Bautista to California, or arrange for him to testify in Mexico.  We disagree.

"An appellate court 'will not reverse a trial court's determination [under Evid. Code, § 240] simply because the defendant can conceive of some further step or avenue left unexplored by the prosecution.  Where the record reveals, . . . that sustained and substantial good faith efforts were undertaken, the defendant's ability to suggest additional steps (usually, as here, with the benefit of hindsight) does not automatically render the prosecution's efforts "unreasonable."  [Citations.]  The law requires only reasonable efforts, not prescient perfection.'  [Citations.]  'That additional efforts might have been made or other lines of inquiry pursued does not affect [a] conclusion [there was due diligence] . . . .  It is enough that the People used reasonable efforts to locate the witness.'  [Citation.]"  (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)  The requirements to establish due diligence and unavailability under Evidence Code section 240, subdivision (a)(5) and the federal Constitution "are the same."  (*People v. Herrera, supra*, 49 Cal.4th at p. 622.)

Here the prosecution expended considerable efforts to secure Bautista's attendance at trial.  Bautista provided the prosecution with contact information (addresses and telephone numbers) for two of his relatives in Mexico.  When the prosecution detective could not reach Bautista, he obtained help from the Department of Homeland Security.  The prosecution detective and homeland security agents collectively attempted to contact Bautista, often with success, at least a dozen times following his September 2010 departure for Mexico.  In July 2011, Bautista told a homeland security agent he was willing to attend trial.  A homeland security agent acquired a visa to facilitate Bautista's entering the United States to attend trial.  When that visa expired, the agent acquired a second visa.  After Bautista told the agent he needed financial assistance, the prosecution arranged to cover the expenses of his attending trial.  The agent conveyed that information to Bautista.  The record establishes that the prosecution exercised due

7

diligence to secure Bautista's attendance at trial. Consequently, trial counsel's concession of due diligence did not deprive appellant of the effective assistance of counsel. (*In re Thomas* (2006) 37 Cal.4th 1249, 1256, 1265 [ineffective assistance of counsel claim fails absent showing a reasonable probability that but for counsel's errors, the result of the proceeding would have been different].)

II

*Exclusion of Evidence Relevant to Victim's Fear of Michoacán Brothers*

Appellant further contends the trial court violated his constitutional right to present a defense by excluding Agent Baltazar's testimony describing statements Bautista made to him in January 2012. We disagree.

Before trial, the prosecution moved to exclude any reference to the reasons for Bautista's unavailability. Trial counsel objected and indicated his intention to call Agent Baltazar to testify that Bautista said he was afraid of the Michoacán brothers. Counsel argued that such statements were relevant to a key issue at trial, the identity of the shooter. Appellant subsequently filed a motion seeking to present the following portion of Baltazar's examination and testimony from the due diligence hearing: "Q Did [Bautista] mention in that contact that he was afraid to come back to the United States and testify? [¶] A He did state he was afraid. He said the main reason for Michoacán is in Canoga Park [*sic*], and he was afraid to come over." The court ruled the statement was inadmissible hearsay. It also excluded it pursuant to Evidence Code section 352,[2] because it was unclear what Bautista meant when he said "Michoacán."

Appellant does not dispute that the proffered testimony constitutes hearsay. He argues the evidence was nonetheless admissible to impeach Bautista. The trial court properly rejected that argument below. (*People v. Pearson* (2013) 56 Cal.4th 393, 455

---

[2] Evidence Code section 352 provides as follows: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[exclusion of marginal impeachment evidence pursuant to Evid. Code, § 352 does not generally violate a defendant's constitutional rights to confrontation].)

The exclusion of the proffered testimony did not violate appellant's constitutional right to present a defense. In *People v. Ayala* (2000) 23 Cal.4th 225, 266, the defendant asserted that the trial court violated his constitutional rights by excluding potentially exculpatory but unreliable hearsay evidence. In rejecting his claim, our Supreme Court stated, "'[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense. [Citations.] [But i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' [Citation.] Thus, '[a] defendant does not have a constitutional right to the admission of unreliable hearsay statements.' [Citations.] Moreover, both we [citation] and the United States Supreme Court [citation] have explained that *Chambers [v. Mississippi* (1973) 410 U.S. 284] is closely tied to the facts and the Mississippi evidence law that it considered. *Chambers* is not authority for the result defendant urges here." (*Ayala,* at p. 269; see also *People v. Garcia* (2005) 134 Cal.App.4th 521, 539 [exclusion of hearsay statement recounting another man's confession to charged crimes did not deprive defendant of fair trial]; *People v. Abilez* (2007) 41 Cal.4th 472, 503 [discretionary evidentiary ruling did not violate right to present a defense].)

"Application of [the] ordinary rules of evidence to . . . proffered testimony did not impermissibly infringe on defendant's right to present a defense." *(People v. Morrison* (2004) 34 Cal.4th 698, 725.) The trial court did not deprive appellant of his right to present a defense by excluding Bautista's hearsay statement concerning Bautista's fear of Michoacan. Moreover, even if the exclusion of that evidence did constitute error, it would be harmless under any standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [harmless error].) Although Bautista originally told officers that the "Michoacán brothers did it [shot him]," he unequivocally identified appellant as the shooter when officers showed him a photographic lineup. Bautista explained that he

9

initially said the Michoacán brothers "did it," "because the fight was with them and . . . Necio [appellant] always hangs out with them." When asked how certain he was that it was Necio who shot him, Bautista responded that he "was in front of me [and] I'm not going to forget that face." Jose Diaz, who was sitting right next to Bautista when he was shot, identified appellant as the shooter. He had no doubt "[b]ecause [he] saw his face right in front of [him]." Padillos knew the Michoacán brothers, and said they were not at the scene during the shooting. Before trial, Padillos identified appellant as the shooter. When officers arrived at the Tellez apartment, Juan and Jose cooperated with them. In contrast, appellant was hiding under a bed, where he remained until officers found him, which provided strong evidence of his consciousness of guilt.

### III

### *Substantial Evidence Claims*

Appellant claims there is not sufficient evidence to support his conviction of an attempted criminal threat or the gang enhancement findings. The record belies his claims.

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.) The substantial evidence standard also applies to gang enhancement findings. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322.)

*Substantial Evidence - Attempted Threat*

Appellant argues that there is insufficient evidence to support his attempted criminal threat conviction because his statements to the victim do not amount to a threat to commit a crime. We disagree.

Section 422 makes it a crime to "willfully threaten[] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety . . . ." (See also *People v. Toledo* (2001) 26 Cal.4th 221, 227-228.) "[I]f a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Toledo,* at p. 231; *In re Sylvester C*. (2006) 137 Cal.App.4th 601, 607.)

Appellant's attempted threat conviction is based on the statement he made to Bautista during his fight with Jose Tellez: "Be very careful. When I was out of jail I killed two people. I killed two people in El Cielito. You don't know who I am[.] I know who you are. . . . I'm Canoga." Appellant argues that the "statement, 'Be very careful,' hardly amounts to a threat to commit any crime." Citing *In re Ricky T.* (2001) 87 Cal.App.4th 1132, he further argues that "in examining the threats in the context and under the surrounding circumstances, it is clear that the threat was not a real, genuine, true threat." His reliance on *Ricky T.* is unavailing. *Ricky T.* addressed the sufficiency of the evidence to support a completed threat, rather than an attempted threat. Moreover, it

11

involved a high school student who became angry when a teacher accidentally hit him with a door as he opened it. After cursing the teacher and saying he would get him and "'kick [his] ass,'" the student was suspended from school. (*Id*. at p. 1137.) The teacher waited until the next day to call the police. The appellate court reversed the finding that the student made a terrorist threat, and concluded there was no immediacy to the threat or any showing of sustained fear. (*Id*. at pp. 1137-1138.)

In assessing whether a statement constitutes a threat, we must consider both the words and "all of the surrounding circumstances." (*People v. Martinez* (1997) 53 Cal.App.4th 1212, 1218.) Here they support the inference that appellant's statement was a threat to cause Bautista physical harm. Unlike the emotional outburst in response to an accidental impact in *Ricky T.,* appellant threatened Bautista in response to his aggression against appellant's companion. Moreover, we reject appellant's suggestions that his words were not threatening. He told Bautista to be careful, that appellant had killed two people, that appellant knew who Bautista was, and that appellant was "Canoga." Canoga was a local criminal street gang whose primary activities included murder and other violent crimes. Appellant made the statements in Canoga territory. Substantial evidence supports the attempted threat conviction.

*Substantial Evidence - Gang Benefit Enhancement*

Appellant contends there is not sufficient evidence to support the gang benefit enhancements for the attempted murder and attempted threat because "there was no evidence presented that the shooting was gang related." We disagree.

Officer Flores testified as the prosecution's gang expert. He had special expertise concerning the Canoga Park Alabama Street gang. Canoga's territory includes the shooting scene and the Tellez brothers' Variel apartment. Canoga's primary activities include murder, robbery, assault, extortion, burglary, possession of firearms, vandalism, and narcotics offenses.

12

Appellant is an admitted Canoga gang member who uses the moniker Necio. Alejandro Flores is also a Canoga member. His moniker is "Sicko." When presented with a hypothetical set of facts mirroring those of the charged crimes, Officer Flores opined that such activities would have been specifically intended to promote and assist criminal conduct by Canoga gang members.

A gang enhancement requires proof of the existence of a criminal street gang and that the offense was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(4).)

"In order to prove the elements of the criminal street gang enhancement, the prosecution may . . . present expert testimony on criminal street gangs." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048.) An expert may give opinions regarding the knowledge and intent of a hypothetical gang member. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946, fn. 3.) "[A] trier of fact may rely on expert testimony about gang culture and habits to reach a finding on a gang allegation." (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196.)

In challenging the sufficiency of the evidence to support the gang benefit enhancements, appellant argues there was no evidence that the shooting was gang related. Appellant is wrong. The commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. (*People v. Villalobos, supra*, 145 Cal.App.4th at p. 322.) Appellant committed the attempted murder of Bautista with the assistance of Sicko, a fellow Canoga gang member. While attempting to threaten Bautista, appellant stressed his membership in Canoga. In addition, gang expert witness Flores opined that appellant committed the crimes for the benefit of the Canoga gang. (*People v. Gardeley* (1996) 14 Cal.4th 605, 619 [expert testimony held sufficient to support finding that defendants committed crimes

13

with specific intent to promote criminal conduct by street gang].)  Substantial evidence supports the gang benefit enhancements.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:



GILBERT, P. J.



YEGAN, J.

Michael Jesic, Judge

Superior Court County of Los Angeles

_____


Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Timothy M. Weiner, Deputy Attorney General, for Plaintiff and Respondent.